THE STATE OF OHIO, APPELLEE, *v.* HUTTON, APPELLANT.

[Cite as *State v. Hutton,* 100 Ohio St.3d 176, 2003-Ohio-5607.]

(Nos. 2000–0816 and 2000–1540—Submitted June
3, 2003—Decided November 5, 2003.)

MOYER, C.J.

{¶ 1} In 1986, a jury found that appellant, Percy "June" Hutton, murdered Derek "Ricky" Mitchell and attempted to kill Samuel Simmons Jr. on September 16, 1985. Hutton was convicted of aggravated murder with two death specifications. After a penalty hearing, the trial court sentenced Hutton to death.

{¶ 2} Hutton had once been a close friend of Mitchell and Simmons. However, Hutton became angry with the two men because he believed that they had stolen from him. On Friday, September 13, or Saturday, September 14, 1985, outside the house where Samuel Simmons Jr., then lived, Hutton confronted Simmons over the theft of a sewing machine belonging to Hutton.

{¶ 3} Claiming that he had seen Mitchell trying to sell the machine, Hutton demanded its immediate return. Simmons suggested that Hutton talk to Mitchell. During this conversation, Mitchell arrived. He and Hutton entered the residence and went upstairs together. When they returned, according to Simmons, Hutton said that "it wasn't what he was looking for and if he found out we had anything to do with what was missing or stolen he was going to kill us." Hutton also told Mitchell, "I'm tired with you f* * *ing with me and stuff like that."

{¶ 4} Around midnight on Monday, September 16, 1985, Hutton drove to Simmons's house in a gray Chrysler Cordoba, accompanied by Bruce Laster, whose sister was engaged to Hutton. Hutton asked Simmons to come with him and help him work on a car. When Simmons got into Hutton's car, he noticed a .22–caliber rifle lying on the back seat.

{¶ 5} Hutton drove to Mitchell's house, stating that he wanted to talk to Simmons and Mitchell. When they arrived, Simmons went in and brought Mitchell outside, telling him that "June wanted to talk to him." Hutton then confronted Mitchell, demanding the return of his sewing machine and accusing Mitchell of stealing some tires from Hutton's backyard. Hutton said that he had hidden $750 in the sewing machine.

{¶ 6} Mitchell denied taking the machine. However, Hutton insisted that Mitchell had tried to sell it to a Mr. Evans. Hutton demanded that Mitchell come with him to Evans's house to settle the issue. Hutton threatened to "f* * * [Mitchell] up" if Evans confirmed Mitchell's guilt.

{¶ 7} Mitchell and Simmons got into the car. Before pulling away from the curb, Hutton pointed the rifle into Simmons's side and said: "I don't appreciate you all breaking in my sister's house."

{¶ 8} Instead of going to Evans's house, Hutton drove to a parking lot behind an RTA bus facility. Hutton got out of the car and ordered Mitchell to get out as well. Hutton and Mitchell then walked a short distance from the car. Simmons could not hear their conversation, but he saw Hutton put a pistol against Mitchell's head.

{¶ 9} Hutton and Mitchell returned to the car. With Mitchell giving directions, Hutton drove to an area known as "the Projects." Hutton and Mitchell went into a building and emerged after a few minutes with a white sewing-machine case.

{¶ 10} Hutton drove to his mother's house, took the case inside, and returned to the car. He then drove to the next street and pulled into an alley where a Cadillac El Dorado was parked. Hutton told Simmons that the El Dorado was the car he wanted to work on. Simmons got out of Hutton's car. Hutton then moved his car to the other end of the street. Leaving Laster and Mitchell in the car, he walked back to the alley, where Simmons was waiting.

{¶ 11} Hutton broke into the El Dorado with a screwdriver. When Simmons got inside, Hutton opened the hood and told him to try starting the engine. Hutton then walked back to Simmons, shot him twice in the back of the head, and ran up the alley.

{¶ 12} Unable to move at first, lying half in and half out of the car, Simmons cried for help. He managed to get up and stagger away in search of assistance. Simmons went first to the nearby home of Hutton's mother, then to Mary Etta

Pollard's house next door. He banged on Pollard's front door and cried for help. Then he heard Hutton's car coming out of the nearby alley. He ran into Pollard's back yard and pounded on the back door, shouting that he had been shot.

{¶ 13} Hutton drove up and stopped in front of Pollard's house. He urged Simmons to "come here" or "come from back there." Hutton noticed that Pollard's son was looking out from his front door and told him to close the door. Simmons begged Hutton to take him to the hospital. Hutton said, "Just shut up and get in the car," and Simmons obeyed. Mitchell and Bruce Laster were in the car with Hutton.

{¶ 14} Telling Mitchell that some unknown assailant had shot Simmons, Hutton drove to St. Luke's Hospital. Simmons asked Mitchell to go inside with him, but Mitchell said, "No. We [are] going to get the mother-f* * *er that did this to you."

{¶ 15} At 2:30 a.m., Mitchell, Hutton, and Laster returned to Mitchell's home. They woke Mitchell's girlfriend, Eileen Sweeney, and took her to the hospital, where they dropped her off. Sweeney went into the hospital to visit Simmons. Telling her that Hutton had shot him, Simmons sent her to warn Mitchell to get out of the car. She went outside, but the car was gone.

{¶ 16} Hospital security officer Paul Whitcomb saw a Chrysler Cordoba drop Simmons off and leave "in a hurry." About half an hour later, Whitcomb saw the same car drop off Sweeney. After Sweeney went inside, Whitcomb saw the same car parked across the street from the hospital. He sent security officer Gary Barnhard to get the license number. As Barnhard drove past the car, he saw its two occupants crouch down in an attempt at concealment. Then the car left. A subsequent check of the license number disclosed that the gray Chrysler was registered to Hutton's fiancée, Celeste Laster.

{¶ 17} Hutton and Bruce Laster later returned to the hospital without Mitchell. Sweeney was still there. Hutton told her that Mitchell was at home and offered to drive her back. However, once he had Sweeney inside the car, Hutton took her to a park instead. There, Hutton and Sweeney got out of the car. Laster then drove off, and Hutton proceeded to rape Sweeney. During the rape, Hutton told Sweeney that "Ricky wasn't coming back." According to Sweeney, Hutton had in his possession a small handgun with a white handle and a silver-colored barrel.

{¶ 18} When Laster returned with the car, Sweeney saw Hutton remove two rifles from the trunk and put them in the rear passenger compartment. Hutton then drove Sweeney home to the apartment she shared with Mitchell.

{¶ 19} When they arrived, Mitchell was not there. The door to the apartment had been damaged and the apartment was in disarray. Sweeney was too "scared and nervous" to drive, so Hutton drove her to the home of LaWanda Mitchell, the sister of Ricky Mitchell. Hutton followed Sweeney into LaWanda's house. According to Sweeney, Hutton told her that "Ricky [Mitchell] wasn't coming back," and that "if [she] told, someone would be looking for [her]."

{¶ 20} On Tuesday, September 17, Hutton drove to Indianapolis to enroll in a course for automotive mechanics at the Lincoln Technical Institute.

{¶ 21} On September 30, 1985, the body of Derek Mitchell was found near an intersection in Cleveland with a large tire lying on the body. An autopsy disclosed that Mitchell had been shot to death. Two .22–caliber long rifle bullets were recovered from the body; a firearms expert testified that these could have been fired from either a rifle or a handgun. The expert testified that the bullets that killed Mitchell had the same class characteristics as a bullet that had been removed from Simmons's head, but he could not tell whether all three had been fired from the same gun. The murder weapon was never found.

{¶ 22} The defense presented evidence that Mitchell was not killed on September 16, 1985, but at some later time while Hutton was in Indianapolis. Denise Richardson testified that she spoke to Mitchell at 3:00 p.m. on September 17, 1985, the day after the state claims Mitchell was murdered. According to Hutton, he was in Indianapolis at the time Richardson spoke to Mitchell. Hutton claimed that he stayed in Indianapolis until October 3, except for two brief visits to Cleveland on September 21 and 28. An employee of the Indianapolis YMCA saw Hutton there sometime after 4:00 p.m. on September 17. The YMCA employee testified that Hutton had paid rent for the period of September 17 through October 3.

{¶ 23} On October 4, 1985, Cleveland Police Detective Robert Moore spoke to Hutton on the telephone. Hutton agreed to return to Cleveland and surrender to Moore at a prearranged time and place. On October 5, Hutton surrendered.

{¶ 24} Hutton and Laster were jointly indicted on two counts of aggravated murder for killing Derek Mitchell. The first count charged that they committed the murder with prior calculation and design. R.C. 2903.01(A). The second charged them with murdering Mitchell while committing, attempting, or fleeing the commission or attempted commission of kidnapping. R.C. 2903.01(B). Each murder count carried two capital specifications: a course-of-conduct specification, R.C. 2929.04(A)(5), and a felony-murder kidnapping specification, R.C. 2929.04(A)(7). Hutton and Laster were also indicted for kidnapping Mitchell and Simmons, and for the attempted murder of Simmons. Each count carried a firearm specification.

{¶ 25} Hutton was tried separately from Laster. The jury convicted Hutton of all charges and specifications. After a mitigation hearing, the jury recommended a death sentence. The trial judge sentenced Hutton to death.

## Proceedings on Appeal

{¶ 26} Represented by the now-deceased Floyd B. Oliver, Hutton appealed his convictions to the Court of Appeals for Cuyahoga County. The court of appeals reversed Hutton's convictions and sentence and remanded the cause to the common pleas court for retrial. *State v. Hutton* (Apr. 28, 1988), Cuyahoga App. No. 51704, 1988 WL 39276 (*"Hutton I"*). Having reversed the convictions, the court of appeals did not perform an independent review of Hutton's death sentence.

{¶ 27} We allowed the state's motion to certify the record. *State v. Hutton* (1988), 39 Ohio St.3d 716, 534 N.E.2d 88. Hutton filed a cross-appeal. 41 Ohio St.3d 704, 534 N.E.2d 1206; *State v. Hutton* (1989), 41 Ohio St.3d 725, 535 N.E.2d 1370. Hutton was represented in this court by Oliver and David L. Doughten.

{¶ 28} We sustained the state's propositions of law, rejected Hutton's propositions on cross-appeal, and reversed the judgment of the court of appeals. *State v. Hutton* (1990), 53 Ohio St.3d 36, 559 N.E.2d 432 (*"Hutton II"*). Following the precedent set in *State v. Gillard* (1988), 40 Ohio St.3d 226, 235, 533 N.E.2d 272, we remanded the cause to the court of appeals, directing that court to perform an independent review of the death sentence in accordance with R.C. 2929.05(A). *Hutton II*, 53 Ohio St.3d at 50, 559 N.E.2d 432.

## The Appeal from Remand (No. 2000–1540)

{¶ 29} On remand, the court of appeals affirmed the death sentence. *State v. Hutton* (1991), 72 Ohio App.3d 348, 594 N.E.2d 692 (*"Hutton III"*). Oliver filed a motion for reconsideration on Hutton's behalf. The court of appeals denied the motion. Hutton did not file an appeal of that judgment to this court.

{¶ 30} On August 21, 1991, Oliver died. Since no appeal had been filed, no further action occurred until July 17, 1996, when we granted the state's motion to set an execution date. 76 Ohio St.3d 1421, 667 N.E.2d 24. On September 19, 1996, we stayed execution pending completion of postconviction proceedings. 76 Ohio St.3d 1480, 669 N.E.2d 861. On October 18, 2000, we granted Hutton's motion for a delayed appeal of the 1991 judgment of the court of appeals on remand. 90 Ohio St.3d 1441, 736 N.E.2d 903. Case No. 2000–1540, which we decide today, is that delayed appeal.

## The Application for Reopening (No. 2000–0816)

{¶ 31} On April 21, 1997, Hutton filed in the court of appeals an application for reopening of his direct appeal, pursuant to App.R. 26(B). Hutton's application

alleged ineffective assistance of appellate counsel based on failure to raise three issues in the court of appeals in *Hutton I,* and also because counsel had failed to raise other issues in this court in *Hutton II.*

{¶ 32} The court of appeals denied the motion on March 20, 2000. *State v. Hutton* (Mar. 20, 2000), Cuyahoga App. No. 51704, 2000 WL 301097 *("Hutton IV").* Hutton now appeals from this judgment. He subsequently moved to consolidate No. 2000–0816 with his delayed appeal in No. 2000–1540 for purposes of oral argument and disposition. On July 25, 2001, we granted the motion to consolidate. 92 Ohio St.3d 1446, 751 N.E.2d 484. Today, we decide the consolidated appeals.

## I. Ineffective Assistance of Appellate Counsel

{¶ 33} A convicted defendant is entitled to the effective assistance of counsel on his first appeal as of right. *Evitts v. Lucey* (1985), 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821. In his proposition of law in case No. 2000–0816, Hutton contends that his appellate counsel failed to effectively assist him in his original appeal in 1988.

{¶ 34} In case No. 2000–1540, the appeal from *Hutton III* (the court of appeals' proceedings on remand), Hutton asserts five claims of ineffective appellate assistance. Three claims involve *Hutton I,* his original appeal in the court of appeals; one claim involves *Hutton II,* his 1989 cross-appeal to this court; and one involves *Hutton III.* In case No. 2000–0816, the appeal from *Hutton IV* (the denial of reopening), Hutton includes only the claims involving *Hutton I* and *II.*

### A. Original Appeal in Court of Appeals (*Hutton I*)

{¶ 35} In Parts A through C of his first proposition of law, Hutton claims that his counsel in *Hutton I* failed to raise three issues before the court of appeals. The state contends that Hutton's ineffective-appellate-assistance claim is res judicata, and that it lacks merit as well.

#### 1. Res Judicata Analysis

{¶ 36} In *Hutton II,* Hutton raised seven propositions of law on cross-appeal from the judgment of the court of appeals. We decided six of those issues— Hutton's first and third through seventh propositions of law on cross-appeal— adversely to Hutton. Having sustained several of the state's propositions of law, we reversed the court of appeals' judgment and thereby reinstated Hutton's convictions. We therefore remanded this case to the court of appeals for the sole purpose of allowing that court to perform its statutorily mandated independent review. Id. at 50, 559 N.E.2d 432. "The fact that the cause was remanded to the court of appeals for re-evaluation of the death sentence in no way implicated the

finality of those convictions." *State v. D'Ambrosio* (1995), 73 Ohio St.3d 141, 143, 652 N.E.2d 710.

{¶ 37} Hutton's claims in the *Hutton II* cross-appeal did not include any claim that his appellate counsel had been ineffective in *Hutton I.* "Where an argument could have been raised on an initial appeal, *res judicata* dictates that it is inappropriate to consider that same argument on a second appeal following remand." *D'Ambrosio,* 73 Ohio St.3d at 143, 652 N.E.2d 710. Accord *State v. Gillard* (1997), 78 Ohio St.3d 548, 549, 679 N.E.2d 276 (on appeal after remand, "new issues" are barred by res judicata). Since Hutton's ineffective-appellate-assistance claims pertaining to his counsel's performance in *Hutton I* could have been raised on his *Hutton II* cross-appeal, they would normally be res judicata on appeal from remand.

{¶ 38} Similarly, since Hutton did not raise the ineffective-appellate-assistance claim in his *Hutton II* cross-appeal, res judicata would ordinarily bar him from raising it in his application for reopening under App.R. 26(B). See *State v. Gillard* (1999), 85 Ohio St.3d 363, 365, 708 N.E.2d 708.

{¶ 39} However, Hutton points out that the attorney who had represented him in *Hutton I* continued to represent him before this court in *Hutton II.* We have recognized that an attorney "cannot realistically be expected to argue his own incompetence." *State v. Cole* (1982), 2 Ohio St.3d 112, 114, 2 OBR 661, 443 N.E.2d 169, fn. 1. Cf. *State v. Lentz* (1994), 70 Ohio St.3d 527, 639 N.E.2d 784 (claim of ineffective assistance of trial counsel, raised for first time in postconviction proceedings, is barred by res judicata where appellate counsel is different attorney, even though from same public defender's office as trial counsel). Since Hutton's counsel could not have been expected to raise in *Hutton II* the issue of his own ineffective representation in *Hutton I,* Hutton argues that res judicata does not bar raising the issue now, either in the appeal from remand or on his motion to reopen the *Hutton I* appeal.

{¶ 40} In *Hutton II,* Hutton also had one new attorney who had not represented him in *Hutton I* and was therefore free of any personal conflict.

{¶ 41} Courts of appeals in Ohio have generally held that res judicata bars an ineffective-assistance claim not raised in an appeal, even where the defendant was represented on appeal by his trial counsel, so long as the defendant was also represented on appeal by at least one attorney who had not represented the defendant at trial. See *State v. Zuern* (Dec. 4, 1991), Hamilton App. Nos. C–900481 and C–910229, 1991 WL 256497; *State v. Swiger* (1998), 125 Ohio App.3d 456, 465, 708 N.E.2d 1033; *State v. Broom* (May 7, 1998), Cuyahoga App. No. 72581, 1998 WL 230425; *State v. Landrum* (Jan. 11, 1999), Ross App. No. 98 CA 2401, 1999 WL 22626.

{¶ 42} However, in *State v. Evans* (June 19, 1998), Lucas App. No. L–97–1134, 1998 WL 351884, the court held that, where the appellant continues to be represented by his trial counsel on appeal, "one additional counsel on appeal does not permit the application of *res judicata* to claims of ineffective assistance of [trial] counsel," because "[i]t is unlikely that, as co-counsel with [trial counsel], [new counsel] would be inclined to assert a claim on appeal for ineffective assistance of trial counsel." We agree with this reasoning and today hold that the doctrine of res judicata does not apply to bar a claim of ineffective assistance of appellate counsel not previously raised in an appeal where a defendant was represented on appeal by the same attorney who allegedly earlier provided the ineffective assistance, even where the defendant was also represented on that appeal by another attorney who had not represented the defendant at the time of the alleged ineffective assistance. Accordingly, Hutton's claims that he received ineffective assistance in *Hutton I* are not res judicata, and we proceed to the merits of those claims.

### 2. Merits Analysis

{¶ 43} Hutton claims that his counsel rendered ineffective assistance in his first appeal as of right (i.e., the court of appeals' proceedings in *Hutton I*) by failing to raise three issues.

{¶ 44} Appellate counsel's effectiveness is to be judged by the standard set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. See, e.g., *State v. Mitts*, 98 Ohio St.3d 325, 2003-Ohio-1007, 784 N.E.2d 698, ¶ 4. Hence, to prevail on his ineffective-assistance claim, Hutton must show deficient performance and resulting prejudice. Deficient performance means performance falling below an objective standard of reasonable representation. "Prejudice" means a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 687–688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. See, also, *Williams v. Taylor* (2000), 529 U.S. 362, 390–391, 120 S.Ct. 1495, 146 L.Ed.2d 389; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus.

### a. *DePew* issue

{¶ 45} The trial court, in its penalty-phase jury instructions, listed all seven of the statutory mitigating factors in R.C. 2929.04(B), and the prosecutor discussed all seven in his closing argument, even though several were not raised by the defense. Citing *State v. DePew* (1988), 38 Ohio St.3d 275, 289–290, 528 N.E.2d 542, Hutton contends that the trial court and the prosecutor erred in discussing mitigating factors on which Hutton had not presented evidence.

{¶ 46} Hutton correctly contends that such comment is inconsistent with *DePew.* "If the defendant chooses to refrain from raising some of or all of the

factors available to him, those factors not raised may not be referred to or commented upon by the trial court or the prosecution.  * * *

{¶ 47} "[I]t is the defendant who has the right to present and argue the mitigating factors.  If he does not do so, no comment on any factors not raised by him is permissible."  38 Ohio St.3d at 289, 528 N.E.2d 542.

{¶ 48} Hutton claims that his appellate counsel rendered ineffective assistance by not raising the *DePew* issue in the court of appeals.  This claim lacks merit.

{¶ 49} First, *DePew* was not available as precedent to Hutton's appellate counsel.  The court of appeals issued its opinion in *Hutton I* on April 28, 1988. We did not decide *DePew* until four months later, on August 31, 1988.

{¶ 50} "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.  Because attorney performance is not to be judged by hindsight, courts generally do not find that an attorney performs deficiently by failing to anticipate a future decision or development in the law.  See *State v. Smith* (1991), 72 Ohio App.3d 342, 345, 594 N.E.2d 688.  See, also, *Clark v. Moran* (C.A.1, 1991), 942 F.2d 24, 33; *Jameson v. Coughlin* (C.A.2, 1994), 22 F.3d 427, 429; *Senk v. Zimmerman* (C.A.3, 1989), 886 F.2d 611, 618; *Lilly v. Gilmore* (C.A.7, 1993), 988 F.2d 783, 786; *Brown v. United States* (C.A.8, 2002), 311 F.3d 875, 878; *Spaziano v. Singletary* (C.A.11, 1994), 36 F.3d 1028, 1039; *Fretwell v. State* (1987), 292 Ark. 96, 728 S.W.2d 180.

{¶ 51} Second, Hutton contends that, had counsel raised the *DePew* issue in the court of appeals, this court "would have had to reverse [his] death sentence." On the contrary, we find it unlikely that a *DePew* claim would have succeeded. We have never reversed a death sentence on the ground that the trial court gave the jury an instruction that neutrally listed all statutory mitigating factors, even though the list included factors on which the defense had not presented evidence or argument.  Such errors have consistently been held either harmless or not plain error.  See *State v. Benge* (1996), 75 Ohio St.3d 136, 141–142, 661 N.E.2d 1019; *State v. Grant* (1993), 67 Ohio St.3d 465, 481, 620 N.E.2d 50; *State v. Brewer* (1990), 48 Ohio St.3d 50, 62, 549 N.E.2d 491; *State v. Cooey* (1989), 46 Ohio St.3d 20, 39, 544 N.E.2d 895; *State v. Benner* (1988), 40 Ohio St.3d 301, 317, 533 N.E.2d 701.  Thus, no reasonable likelihood exists that Hutton would have prevailed on the *DePew* issue had his counsel raised it in *Hutton I*. Part A of Hutton's first proposition of law is overruled.

### b.  Failure to Define "Aggravating Circumstances"

{¶ 52} In the penalty phase, the trial court instructed the jury: "The prosecution has the burden to prove beyond a reasonable doubt that the aggravating

circumstances, of which the Defendant was found guilty, outweigh the factors in mitigation * * *." The instructions further told the jury to recommend a death sentence "if you unanimously * * * find proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors." However, the trial court neglected to inform the jury that the term "aggravating circumstances" meant the specifications of which Hutton had been found guilty in the guilt phase. Defense trial counsel did not object to the instructions.

{¶ 53} Hutton's appellate counsel in *Hutton I* did not raise the issue of the trial court's failure to define "aggravating circumstances." In part B of his first proposition of law, Hutton now contends that appellate counsel's failure to raise this issue constituted ineffective assistance.

{¶ 54} However, because defense trial counsel had not objected to the instructions at trial, any error was waived. Having been waived, the error could not serve as a basis for reversal unless it met the strict standard for plain error. See, generally, *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804; *State v. Barnes* (2002), 94 Ohio St.3d 21, 27, 759 N.E.2d 1240. Because the issue had been waived at trial, appellate counsel could reasonably decide not to try to raise it in the court of appeals. See *State v. Bays* (1999), 87 Ohio St.3d 15, 29, 716 N.E.2d 1126.

{¶ 55} Appellate counsel need not raise every possible issue in order to render constitutionally effective assistance. See *Jones v. Barnes* (1983), 463 U.S. 745, 750–753, 103 S.Ct. 3308, 77 L.Ed.2d 987. "Notwithstanding *Barnes*, it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent. See, *e.g.*, *Gray v. Greer*, 800 F.2d 644, 646 (C.A.7 1986) ('Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome')." *Smith v. Robbins* (2000), 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756.

{¶ 56} Failure to raise the waived instructional issue was not deficient performance constituting ineffective assistance. Part B of Hutton's first proposition of law is therefore overruled.

### c. Trial Counsel's Failure to Object

{¶ 57} Although the *DePew* error and the trial court's instructional error were waived by trial counsel, Hutton's appellate counsel could have argued on appeal that trial counsel's failure to object to these errors amounted to ineffective assistance. In part C of his first proposition of law, Hutton argues that his appellate counsel were ineffective because they failed to raise the issue of trial counsel's failure to object.

{¶ 58} With respect to the *DePew* error, trial counsel was not ineffective for failing to raise the issue. As noted supra, *DePew* was not decided until August 31, 1988, and therefore was not available to trial counsel as precedent. For the reasons discussed earlier, prejudice is also absent.

{¶ 59} Hutton argues that appellate counsel was ineffective in failing to assert trial counsel's ineffectiveness regarding the trial court's failure to define "aggravating factors" for the jury. However, we do not find that this issue was "clearly stronger," *Smith v. Robbins*, 528 U.S. at 288, 120 S.Ct. 746, 145 L.Ed.2d 756, than the issues Hutton's appellate counsel actually did present. Part C of Hutton's first proposition of law is overruled.

### B. Cross–Appeal (*Hutton II*)

{¶ 60} In part D of his first proposition of law, Hutton contends that his counsel before this court in *Hutton II* denied him effective assistance by misreading the court of appeals' opinion and thereby failing to raise certain issues before us on cross-appeal. See *Hutton II*, 53 Ohio St.3d at 44, 559 N.E.2d 432.

{¶ 61} However, Hutton's appeal from the court of appeals to this court was not his first appeal, but his second. "Having no constitutional right to counsel on a second appeal, [Hutton] had no constitutional right to the effective assistance of counsel." *State v. Buell* (1994), 70 Ohio St.3d 1211, 1212, 639 N.E.2d 110. Part D of Hutton's first proposition of law is overruled.

### C. 1991 Decision on Remand to Court of Appeals (*Hutton III*)

{¶ 62} In Part E of his first proposition of law, Hutton claims that he was denied the effective assistance of counsel when the court of appeals considered his case on remand from this court in 1991.

{¶ 63} Because the court of appeals in *Hutton I* reversed Hutton's convictions, that court did not perform an independent review of Hutton's death sentence. Therefore, when our decision in *Hutton II* reinstated his convictions, we remanded the cause to the court of appeals so that court could independently review the sentence, as was then required by R.C. 2929.05(A). See *Hutton II*, 53 Ohio St.3d at 50, 559 N.E.2d 432. No other issues remained for the court of appeals to determine on remand, inasmuch as the court of appeals had already addressed each of Hutton's assignments of error in *Hutton I*.

{¶ 64} On November 2, 1990, Hutton filed a motion asking the court of appeals to appoint counsel. The court of appeals denied the motion without explanation on January 8, 1991. On January 17, 1991, the court of appeals announced its judgment in *Hutton III*, affirming the death sentence on independent review. On January 28, 1991, Hutton filed a motion for reconsideration. On February 1,

1991, the court of appeals journalized its opinion in *Hutton III*, explaining its reasons for affirmance. See *Hutton III*, 72 Ohio App.3d 348, 594 N.E.2d 692.

{¶ 65} Hutton contends that when the court of appeals denied his motion for appointment of counsel, it denied him the assistance of counsel to which he was constitutionally entitled. Hutton contends that he was not represented by *any* counsel during the remand.

{¶ 66} However, Hutton's claim is incorrect. The record shows that his motion for reconsideration, filed January 28, 1991, was signed by the same attorney who had represented him during both *Hutton I* and *Hutton II*.

{¶ 67} It is true that no brief was filed on Hutton's behalf during the remand. The court of appeals did not invite briefing by either party. But there was no need to do so, for both parties had already had a full opportunity to brief the issue of the appropriateness of the death sentence during the original *Hutton I* proceedings. Moreover, Hutton's counsel had taken that opportunity. In the *Hutton I* appellate brief of October 26, 1988, the third assignment of error read as follows: "IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ART. I, §§ 9 AND 16 OF THE OHIO CONSTITUTION, THE APPELLANT'S SENTENCE OF DEATH IS INAPPROPRIATE AND DISPROPORTIONATE TO SIMILAR CASES."

{¶ 68} Since the parties had already briefed the sentencing issue once, there was no need for rebriefing or reargument. The record had not changed since *Hutton I*. The court of appeals could quite properly consider the case on the briefs that had already been filed. Part E of Hutton's first proposition therefore lacks merit and is overruled.

## II. Independent Sentence Review

{¶ 69} In his second proposition of law, Hutton contends that the death sentence in this case is inappropriate. This claim invokes our duty of independent review under R.C. 2929.05. It is that task to which we now turn.

{¶ 70} Under R.C. 2929.05(A), we independently review the death sentence in every capital case in which we find no reversible legal error on the capital conviction. We must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentence is proportionate to those affirmed in similar cases.

### Aggravating Circumstances

{¶ 71} Hutton was found guilty of two capital specifications. Under R.C. 2929.04(A)(5), he was found guilty of engaging in a course of conduct involving the

purposeful killing of Ricky Mitchell and the purposeful attempt to kill Samuel Simmons. Under R.C. 2929.04(A)(7), he was found guilty of committing aggravated murder while committing, attempting to commit, or fleeing after the commission or attempted commission of kidnapping.

{¶ 72} The evidence supports these findings. As we noted in *Hutton II*:

{¶ 73} "The evidence * * * points ineluctably to Hutton as the murderer of Derek Mitchell. Hutton had a strong motive: revenge for the theft of the sewing machine and the money hidden therein. Hutton claimed to have been told by Evans that Mitchell had tried to sell Evans a sewing machine. Hutton accused Mitchell of 'breaking in my sister's house.' In response to Hutton's demands, Mitchell actually produced a sewing machine, which he turned over to Hutton. Finally, Hutton carried out his threat to shoot Simmons. On this record, it is clear that Hutton believed that Mitchell and Simmons stole his machine.

{¶ 74} "Hutton attempted to kill Simmons with a .22 caliber revolver. He also had a .22 caliber rifle in his car. Mitchell was killed with a .22 caliber weapon. Expert testimony established that Simmons could have been shot with the same gun. Eileen Sweeney corroborated Simmons's description of Hutton's pistol. Mitchell's corpse was found with a tire lying on it—a significant fact in light of the evidence that Hutton believed that Mitchell had stolen tires from him.

{¶ 75} "Hutton told Eileen Sweeney that 'Ricky wasn't coming back,' and she should 'forget about him.' These statements clearly show that Hutton knew Mitchell was dead. He later informed her that 'if * * * [she] told[,] someone would be looking for * * * [her].' This threat indicates consciousness of guilt.

{¶ 76} "Events confirmed Hutton's statement that Mitchell 'wasn't coming back.' Eileen Sweeney * * * never saw Mitchell again after he left her at the hospital. This was unusual, since Sweeney testified that, during their three-year cohabitation, Mitchell '[v]ery seldom' failed to spend the night at their apartment and never left home without telling her.

{¶ 77} "The evidence that the murder was committed with prior calculation and design is, if anything, stronger. Mitchell was shot at least twice, once in the head and once in the chest. * * * When this is added to Hutton's repeated threats against Mitchell's life, a rational trier of fact could hardly fail to find prior calculation and design." 53 Ohio St.3d at 41, 559 N.E.2d 432.

{¶ 78} Moreover, Simmons's testimony that Hutton shot him twice in the head from behind supports the jury's finding of guilty on the course-of-conduct specification. Finally, the evidence supports the jury's finding of kidnapping. *Hutton II,* 53 Ohio St.3d at 41, 559 N.E.2d 432.

## Mitigating Factors

{¶ 79} The only evidence offered by Hutton in the penalty phase was his unsworn statement, in which he professed his innocence, and the presentence investigation report and psychological examination requested by the defense pursuant to R.C. 2929.03(D)(1). The only mitigating factor expressly offered by Hutton at trial was residual doubt. That is not a valid mitigating factor. *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus. However, the trial record does disclose some other mitigating factors.

{¶ 80} *Provocation:* Under R.C. 2929.04(B)(2), we must consider "[w]hether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation."

{¶ 81} On the state's theory of the case, Hutton killed Mitchell and tried to kill Simmons because they stole money he needed to attend school. Hutton testified that his tuition for the automotive course was $9,700. He made a down payment of $1,500, had taken a $5,300 student loan, and was seeking a $2,200 grant from the state of Ohio. This left him $700 short,[1] which may explain why Hutton was so insistent on recovering the $750 hidden in the sewing machine.

{¶ 82} Nevertheless, provocation deserves very little weight as a mitigating factor. Hutton committed the murder with prior calculation and design; the jury so found by returning a guilty verdict on the first count of the indictment. Moreover, Mitchell's murder occurred some length of time after the alleged theft that may have provoked it. Hutton clearly had time to cool off before resorting to murder.

{¶ 83} *Degree of participation:* Under R.C. 2929.04(B)(6), mitigation exists "[i]f the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts which led to the death of the victim."

{¶ 84} The jury did not make any finding in this case that Hutton was the principal offender. The felony-murder specification alleged, in the alternative, that Hutton "either * * * was the principal offender in the commission of the Aggravated Murder, *or,* if not the principal offender, committed the Aggravated Murder with prior calculation and design." (Emphasis added.) The verdict form for this specification was also phrased in the alternative. For this reason, the jury cannot be said to have found that Hutton was the principal offender.[2]

---

1. When he registered at the Lincoln Institute, however, he discovered that he could not use the grant there.

2. We note, however, that the jury did unanimously find that Hutton killed Mitchell with prior calculation and design when it found Hutton guilty of aggravated murder as charged in the first

Hence, we must examine "the degree of the offender's participation in the offense and * * * in the acts which led to the death of the victim."

{¶ 85} Although the record does not conclusively demonstrate that Hutton was the actual killer, Hutton did instigate Mitchell's murder. Moreover, he played the leading role in that offense. Hutton was driving the car and did almost all of the talking. Hutton was the one who had a motive to kill Simmons and Mitchell, he was the one who had threatened their lives, and he was the one who shot Simmons. Accordingly, we give the (B)(6) factor little weight.

{¶ 86} *Other factors:* Hutton voluntarily returned from Indianapolis and surrendered to Detective Moore. We give some weight to this fact as mitigation under R.C. 2929.04(B)(7): "Any other factors that are relevant to the issue of whether the offender should be sentenced to death."

{¶ 87} *History, character, and background:* Hutton was born on October 28, 1953. The presentence investigation report shows that his father died in 1963, when Hutton was still a child. Although it is not clear whether Hutton's mother and father were ever divorced, Hutton's mother remarried in 1960. However, her second husband abandoned the family in 1965.

{¶ 88} Hutton was self-employed as an automotive mechanic. Before he surrendered to Detective Moore, he was taking courses in that field at Lincoln Technical Institute. He testified in the guilt phase that he had also been employed as a security guard and had completed a six-week, 120–hour course of "security [and] private police training" at Case Western Reserve University. He had also been on general relief and food stamps "off and on" since 1981, and he admitted that he had never reported his income from repairing cars to the welfare authorities.

{¶ 89} There was also guilt-phase testimony about Hutton's good reputation. Samuel Simmons Sr., the father of victim Samuel Simmons Jr., testified in the guilt phase that Hutton had a "[v]ery good" reputation for truthfulness. Simmons Sr. also testified that he "would put [his] life in [Hutton's] hands any day." We give some mitigating weight to Hutton's history, character, and background.

{¶ 90} *Nature and circumstances of the offense:* Nothing mitigating appears in the nature and circumstances of the offense. The murder of Derek Mitchell was characterized by treachery and deceit. After he shot Simmons from behind, Hutton used Simmons's shooting to lure Mitchell to his death.

{¶ 91} Although Hutton's voluntary surrender and his history, character, and background are entitled to some weight in mitigation, the aggravating circum-

---

count of the indictment. See *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 197–198, 616 N.E.2d 909.

stances here are extremely grave. In this case, we find that the R.C. 2929.04(A)(5) multiple-murder aggravating circumstance carries great weight in aggravation. See *State v. Campbell* (2002), 95 Ohio St.3d 48, 58, 765 N.E.2d 334. The R.C. 2929.04(A)(7) aggravating circumstance in this case consists of a calculated murder set up by a treacherous kidnapping. We find that these aggravating circumstances outweigh the mitigating factors in this case beyond a reasonable doubt.

## Proportionality Review

{¶ 92} In his third proposition of law, Hutton contends that the death sentence in this case is "excessive and disproportionate" to sentences in similar cases.

{¶ 93} Hutton claims that one "similar case" we should consider is the case of Hutton's co-defendant, Bruce Laster. According to the parties, Laster pled guilty to involuntary manslaughter and was sentenced to 7 to 25 years.[3] Hutton argues that, because there was no proof of who actually shot Mitchell, it cannot be justified to sentence Hutton to death when Laster received a sentence of only 7 to 25 years.

{¶ 94} However, we find that Laster's case is not a "similar case" for purposes of R.C. 2929.04. Laster was not convicted of aggravated murder, nor did he receive a death sentence. See *Gillard*, 78 Ohio St.3d at 558, 679 N.E.2d 276; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

{¶ 95} The death sentence in this case is proportionate to death sentences we have approved in similar cases with specifications under R.C. 2929.04(A)(5) and (A)(7). See *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568; *State v. Dickerson* (1989), 45 Ohio St.3d 206, 543 N.E.2d 1250; *State v. Hawkins* (1993), 66 Ohio St.3d 339, 612 N.E.2d 1227; *State v. Dunlap* (1995), 73 Ohio St.3d 308, 652 N.E.2d 988; *State v. Palmer* (1997), 80 Ohio St.3d 543, 687 N.E.2d 685; *State v. Jackson* (2001), 92 Ohio St.3d 436, 751 N.E.2d 946.

{¶ 96} In case No. 2000–1540, we affirm Hutton's death sentence. In case No. 2000–0816, we affirm the judgment of the court of appeals.

Judgments affirmed.

RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

---

3. Although we are unable to verify this from the record, Hutton asserts it in his brief and the state agrees that it is true.

192

William D. Mason, Cuyahoga County Prosecuting Attorney, and Lisa Reitz Williamson, Assistant Prosecuting Attorney, for appellee.

James A. Draper, Cuyahoga County Public Defender, and Robert M. Ingersoll, Assistant Public Defender, for appellant.