[Cite as *State v. Herron*, 2022-Ohio-2514.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

|                           |   |                                       |
|---------------------------|---|---------------------------------------|
| STATE OF OHIO             | : |                                       |
|                           | : | Appellate Case No. 29380              |
| Plaintiff-Appellee        | : |                                       |
|                           | : | Trial Court Case No. 2017-CR-2437     |
| v.                        | : |                                       |
|                           | : | (Criminal Appeal from                 |
| KEASON HERRON             | : | Common Pleas Court)                   |
|                           | : |                                       |
| Defendant-Appellant       | : |                                       |

· · · · · · · · · · ·

O P I N I O N

Rendered on the 22nd day of July, 2022.

· · · · · · · · · · ·

MATHIAS H. HECK, JR. by ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

KEASON HERRON, #A747-515, Chillicothe Correctional Institution, 15802 State Route 104 North, Chillicothe, Ohio 45601
      Defendant-Appellant, Pro Se

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Keason Herron appeals from an order of the Montgomery County Court of Common Pleas, which overruled his "Motion to Correct Sentence." Herron filed a delayed notice of appeal on February 8, 2022, which we allowed in an entry issued on March 8, 2022.

{¶ 2} We set forth the history of the case in *State v. Herron*, 2d Dist. Montgomery No. 28146, 2019-Ohio-3292 ( "*Herron I*"), and repeat it herein in pertinent part:

> The record establishes that on the evening of August 4, 2017, the victim, Leanette Newton, was socializing at a residence located in Dayton, Ohio, on Dearborn Avenue (hereinafter "the Dearborn residence"). The residence in question belonged to the mother of defendant-appellant, Herron. The Dearborn residence had a detached garage that was used by people in the neighborhood as a place to congregate and drink alcohol. Between approximately 4:00 p.m. and 6:00 p.m. that evening, Herron arrived at the Dearborn residence, briefly spoke to Newton, and left shortly thereafter. At some point that evening, Newton also left the Dearborn residence.
>
> Here, we note that Newton and Herron had been involved in an "on-off" relationship since approximately 2006 or 2007. Herron testified that his relationship with Newton was marked by periods of instability, volatility, and violence from both parties. Herron further testified that his and Newton's

alcohol use greatly exacerbated their relationship difficulties. Herron testified that, by August 4, 2017, he and Newton were no longer in a relationship, and Newton had moved all of her personal property out of the residence she previously shared with Herron on Blanche Street in Dayton, Ohio.

Later on the night of August 4, 2017, Herron returned to the Dearborn residence and began drinking with others who were present. Eventually, Newton arrived back at the Dearborn residence and also began drinking. Herron testified that, in order to avoid a confrontation with Newton, he immediately left the Dearborn residence and drove to his current girlfriend's apartment, but he was unable to gain entrance. Thereafter, Herron drove to his residence on Blanche Street.

After Herron left, Newton remained at the Dearborn residence and continued to drink alcohol for a short time. Kimberly Moss, another individual who was drinking alcohol at the Dearborn residence, testified that at approximately 11:30 p.m., Newton asked Moss for a ride to her mother's house nearby. At Newton's request, Moss drove her vehicle past Herron's residence on Blanche Street. Newton then asked Moss to drop her off at a park located behind Herron's residence.

Shortly thereafter, Newton walked over to Herron's residence and began yelling at Herron while they stood in his front yard. Herron testified that he then went inside his house, leaving Newton outside. Herron testified

that once he was inside, he observed that it looked as if someone had broken into and ransacked his house. Herron testified that he thought Newton had broken into his house. (We note that the police investigation found that there was no damage to any of the doors or windows in the residence. The police also found that all of the windows were locked the next morning on August 5, 2017.) Herron testified that in order to scare Newton, he picked up a handgun from inside his house, walked outside, and fired four shots into the ground. Herron testified that after he fired the warning shots, Newton yelled at him and walked away. (We note here that the police were unable to find any shell casings in the area where Herron stated that he fired the handgun. Additionally, no handgun was ever recovered by the police during their investigation.)

Herron testified that, at this point, he got into his truck and drove over to Newton's mother's residence where Newton was then living. Upon arriving, Herron asked Newton's mother to come to his residence and retrieve her daughter. In the alternative, Herron asked Newton's mother to send Newton's brother over to help. Newton's mother refused to help, so Herron left and drove back to his residence.

Herron testified that after entering his residence, he heard a noise behind him and turned around to see Newton walking toward him with a "stick." Herron testified that he ran into his bedroom and retrieved a shotgun from his closet. Herron testified that he ejected the shells out of the shotgun

and began to "jab" Newton with the barrel. Admittedly "furious" and "seeing red," Herron struck Newton several times, eventually causing her to fall down on the floor. Herron testified that at this point, he grabbed Newton around her neck and began choking her in an effort to wrest the stick from her hand. Herron testified that after successfully doing so, he hit Newton with the stick and then threw it outside in the yard.

Herron testified that Newton remained seated on the floor and began falling asleep. After Newton began to snore, he went into his bedroom and fell asleep for a few hours. When Herron woke up, he observed that Newton had not moved from the position that he last saw her in hours earlier. Herron testified that he then attempted to rouse Newton, but she did not respond.

Later that morning, Herron's uncle, Dennis Richardson, drove his truck to Herron's residence for assistance in repairing his lawnmower. Richardson testified that upon arriving at Herron's residence, he observed that the front door was standing open. When Richardson approached the residence, Herron came outside and told Richardson to enter the house. Once the men were inside the house, Herron gestured toward Newton's body and stated to Richardson, "she died on me." Richardson testified that he initially thought that Herron and Newton were playing a joke on him, and he tried to leave the residence. Herron, however, blocked the door and handed Richardson the shotgun, which had been wrapped in a sheet. Herron told Richardson that he was not supposed to have the shotgun.

Richardson went outside and placed the shotgun in the bed of his truck.

Richardson testified that he then reentered the residence and told Herron to give him a "video camera" in order to prevent Herron from posting anything on social media, as Richardson still believed the whole situation to be a bad prank. Herron then handed Richardson a DVR recording box and a disc containing surveillance video from cameras installed on and around Herron's residence. Richardson went back outside, placed the surveillance items in the bed of his truck, and drove home. Richardson testified that once he reached his residence, he removed Herron's shotgun and surveillance gear from his truck and put the items in his garage. Richardson testified that he believed that Herron would call when and if he needed the items.

After Richardson left, Herron walked down the street to a nearby convenience store where he encountered William Wagner, his stepfather's brother. Wagner testified that he was at the store to purchase some items for another relative while he was on a break from his job at the VA Hospital. Herron approached Wagner and asked to use his cellphone. Wagner handed Herron his cellphone. Herron testified that he then used Wagner's cellphone to call 911 as he walked back toward his residence. Herron was immediately arrested and taken into custody when the police and other emergency personnel arrived at his residence.

Shortly thereafter, Dayton Police Officer Craig Stiver was dispatched to Herron's residence to take photographs of the crime scene. Officer Stiver

took photographs of a long metal bar that had been placed on top of an animal cage, a crowbar retrieved from the kitchen, bloodstains in the hallway and on the door to Herron's bedroom, and bloodstains on Herron's bedroom dresser, stereo cabinet, pillow, and bedsheets. Stiver also photographed bloodstains on and around the toilet in the bathroom.

On August 10, 2017, Herron was indicted for one count of murder, one count of reckless homicide, and one count of felonious assault. At his arraignment on August 15, 2017, Herron appeared and pled not guilty to the charged offenses.

\* \* \*

On July 5, 2018, Herron was charged in a "B" indictment with two counts of tampering with evidence, and one count of having weapons while under disability. The "B" indictment was based upon the State's discovery of the shotgun and DVR equipment that Herron had given to Richardson to hide. On August 9, 2018, Herron filed a jury waiver with respect to the charge of having weapons while under disability.

A three-day jury trial was held on the remaining counts on August 20-22, 2018. At trial, Montgomery County Coroner's Office forensic pathologist Dr. Susan Allen testified that she had performed an autopsy on Newton on August 5 and 6, 2017. Dr. Allen testified that Newton's cause of death was a combination of blunt force trauma and strangulation. Dr. Allen testified that she found several bruises on Newton's face and head, as well

as several circular or semi-circular bruises across Newton's entire body, including her arms, abdomen, and back. Dr. Allen also testified that Newton suffered deep cuts to her jaw, left ear lobe, lips, and the back of her head. Significantly, Dr. Allen testified that Newton had a broken left leg, a broken left arm, and five broken ribs. Lastly, Dr. Allen testified that Newton presented with petechiae on her eyes, which are broken blood vessels indicating that she had been strangled. Dr. Allen testified that, based on the extent of Newton's injuries, she would have lost a great deal of blood and suffered swelling of her brain.

Following his jury trial, Herron was found guilty of murder, felonious assault, and both counts of tampering with evidence. The trial court separately found Herron guilty of having weapons while under disability. The State dismissed the charge of reckless homicide. The trial court merged Herron's convictions for murder and felonious assault, with the State electing to proceed to sentencing for the murder charge. On September 11, 2018, the trial court sentenced Herron to 15 years to life in prison for murder, three years in prison for each count of tampering with evidence, and three years in prison for having weapons while under disability. The trial court ordered the two counts of tampering with evidence to be served concurrently to one another, but consecutively to the remaining counts. The trial court also ordered that Herron's conviction for having weapons while under disability be served consecutively to the other counts, for an

aggregate sentence of 21 years to life in prison.

*Id.* at ¶ 2-14, ¶ 17-19.

{¶ 3} Herron appealed his convictions. We held that the trial court had erred when it precluded him from testifying to and introducing into evidence specific instances of the victim's past violent conduct toward him pursuant to Evid.R. 405(B), to show Herron's state of mind in support of his defense of self-defense. However, we found that the error had been harmless in light of the overwhelming evidence adduced by the State and the fact that Herron had been allowed to testify that the victim had attacked him several times in the past, requiring him to go to the hospital for treatment. Additionally, we held that Herron's convictions for murder and tampering with evidence were supported by sufficient evidence and were not against the manifest weight of the evidence. Finally, we found that Herron's trial counsel was not ineffective for failing to call a defense expert during trial to dispute the testimony of the State's forensic expert. *See Herron I.*

{¶ 4} On May 1, 2020, Herron filed a pro se "Verified Motion to Correct a Void Sentence" in which he argued that his sentence was void because the judgment entry did not contain the judge's signature and the trial court did not properly consider the purposes and principles of sentencing when it imposed Herron's aggregate 21-year prison term. On September 24, 2020, the trial court overruled Herron's motion. Herron did not appeal the order of the trial court.

{¶ 5} On September 21, 2021, Herron filed a pro se "Motion to Correct Sentence." In his motion, Herron raised the following issues: 1) the failure of the trial court to sign his judgment entry; 2) the failure of the trial court to consider his present and future ability to

pay financial sanctions; 3) the imposition of court costs which could potentially subject Herron to performing community service; 4) the award of restitution; 5) the trial court's alleged failure to comply with the post-release control statutes; 6) the trial court's decision to merge his convictions for murder and felonious assault; and 7) the trial court's failure to instruct the jury regarding the "Castle Doctrine."

{¶ 6} On October 14, 2021, the trial court issued an order overruling Herron's "Motion to Correct Sentence," finding that the issues raised in the motion were barred by res judicata. The trial court also addressed the merits of Herron's motion. It found that his judgment entry had been electronically signed by the trial judge. The trial court also found that Herron's argument regarding court costs was moot because the trial court had previously waived any remaining costs in a judgment entry filed on June 22, 2021. In regard to the restitution order, the trial court found that Herron had waived the argument because, at his sentencing hearing, he expressly consented to pay the restitution order to cover the victim's funeral expenses and also waived a hearing to determine the amount. The trial court found that Herron had the present and future ability to pay financial sanctions because he had admitted to owning a house during his jury trial. Furthermore, the trial court held that Herron's convictions for murder and felonious assault had been properly merged for the purposes of sentencing. The trial court found that Herron had been properly advised at sentencing of all necessary information, including the effects of violating post-release control. Finally, the trial court found that the jury had been properly instructed regarding self-defense and that there had been a discussion between the trial court and the parties regarding which instruction was proper.

{¶ 7} Herron now appeals from the trial court's order overruling his October 14, 2021 motion.

{¶ 8} Because they are interrelated, all of Herron's assignments of error will be discussed together:

THE LOWER COURT COMMITTED PREJUDICIAL ERROR IN IGNORING THE CASTLE DOCTRINE.

THE LOWER COURT COMMITTED PREJUDICIAL ERROR IN ORDERING FINANCIAL SANCTIONS.

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 9} In his first assignment, Herron argues that the trial court erred when it failed to instruct the jury regarding the "Castle Doctrine."  In his second assignment, Herron contends that the trial court erred by ordering him to pay restitution in the amount of $2,147.00 for the victim's funeral expenses.   In his third assignment, Herron argues that he received ineffective assistance when his trial counsel 1) failed to request that the trial court instruct the jury regarding the Castle Doctrine; and 2) failed to object to unidentified due process and equal protection violations, the allegedly erroneous post-release control language used by the trial court, and the "mandated financial sanctions procedures." Appellant's Brief p. 5.

{¶ 10}  "Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due

process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment." *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), paragraph nine of the syllabus. Therefore, "any issue that could have been raised on direct appeal," but was not, is "not subject to review in subsequent proceedings." *State v. Saxon*, 109 Ohio St.3d 176, 2006-Ohio-1245, 846 N.E.2d 824, ¶ 16, citing *State v. Hutton*, 100 Ohio St.3d 176, 2003-Ohio-5607, 797 N.E.2d 948, ¶ 37 and *State v. D'Ambrosio*, 73 Ohio St.3d 141, 143, 652 N.E.2d 710 (1995).

{¶ 11} Even if Herron's three assignments of error raised new arguments that he had not raised previously, he could have raised them in his direct appeal. Therefore, any issues regarding the jury instructions, the restitution order imposed by the trial court, and whether his trial attorney provided ineffective assistance of counsel were barred by res judicata. Significantly, Herron raised a claim of ineffective assistance of counsel in *Herron I*, albeit for a different reason. In light of the foregoing, the trial court did not err when it overruled Herron's "Motion to Correct Sentence."

{¶ 12} Herron's assignments of error are overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . . . .

WELBAUM, J. and LEWIS, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Elizabeth A. Ellis
Keason Herron
Hon. Susan D. Solle