RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0254p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

PERCY HUTTON,

          *Petitioner-Appellant,*

    *v.*                       No. 13-3968

BETTY MITCHELL, Warden,

          *Respondent-Appellee*.

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:05-cv-02391—Christopher A. Boyko, District Judge.

Argued: March 16, 2016

Decided and Filed: October 12, 2016

BEFORE: MERRITT, ROGERS, and DONALD, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Michael J. Benza, Chagrin Falls, Ohio, for Appellant. Katherine E. Mullin, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellee. **ON BRIEF:** Michael J. Benza, Chagrin Falls, Ohio, Alan C. Rossman, Jillian S. Davis, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. Katherine E. Mullin, Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellee.

      DONALD, J., delivered the opinion of the court in which MERRITT, J., joined, and ROGERS, J., joined in part. MERRITT, J. (pp. 23–27), delivered a separate concurring opinion. ROGERS, J. (pp. 28–33), delivered a separate opinion dissenting in part.

1

---

**OPINION**

---

BERNICE BOUIE DONALD, Circuit Judge.  Percy Hutton, an Ohio death row inmate, appeals the United States District Court for the Northern District of Ohio's denial of his 28 U.S.C. § 2254 habeas petition.  Hutton was convicted and sentenced to death for murdering Derek "Ricky" Mitchell and attempting to kill Samuel Simmons, Jr. on September 16, 1985.

In his habeas petition, Hutton asserted thirteen grounds for relief.  Of the thirteen claims, six were certified for appeal.  One claim gives this Court the most pause, as it requires us to revisit *Hoffner v. Bradshaw*, 622 F.3d 487 (6th Cir. 2010), and again question whether a state court's independent review of a death sentence during sentencing can cure *any* omission in a jury instruction.  For the reasons that follow, we **REVERSE** the district court's decision in part, **CONDITIONALLY GRANT** Hutton's habeas petition, and **REMAND** this case to the district court with instructions to order Hutton's release from custody unless the state grants a new sentencing hearing within 180 days from the date that this Court issues the mandate.

**I.**

**A.      Factual Background**

In the last state adjudication of Hutton's habeas petition claims, the Ohio Supreme Court made the following findings of fact as to what likely unfolded on the days the crimes for which Hutton was convicted were committed:

> {¶ 1}   In 1986, a jury found that Appellant, Percy "June" Hutton, murdered Derek "Ricky" Mitchell and attempted to kill Samuel Simmons Jr. on September 16, 1985.  Hutton was convicted of aggravated murder with two death specifications.  After a penalty hearing, the trial court sentenced Hutton to death.

> {¶ 2} Hutton had once been a close friend of Mitchell and Simmons. However, Hutton became angry with the two men because he believed that they had stolen from him. On Friday, September 13, or Saturday, September 14, 1985, outside the house where Samuel Simmons Jr., then lived, Hutton confronted Simmons over the theft of a sewing machine belonging to Hutton.

{¶ 3}   Claiming that he had seen Mitchell trying to sell the machine, Hutton demanded its immediate return.  Simmons suggested that Hutton talk to Mitchell.  During this conversation, Mitchell arrived. He and Hutton entered the residence and went upstairs together. When they returned, according to Simmons, Hutton said that "it wasn't what he was looking for and if he found out we had anything to do with what was missing or stolen he was going to kill us."  Hutton also told Mitchell, "I'm tired with you f* * *ing with me and stuff like that."

{¶ 4}   Around midnight on Monday, September 16, 1985, Hutton drove to Simmons's house in a gray Chrysler Cordoba, accompanied by Bruce Laster, whose sister was engaged to Hutton.  Hutton asked Simmons to come with him and help him work on a car.  When Simmons got into Hutton's car, he noticed a .22-caliber rifle lying on the back seat.

{¶ 5}   Hutton drove to Mitchell's house, stating that he wanted to talk to Simmons and Mitchell.  When they arrived, Simmons went in and brought Mitchell outside, telling him that "June wanted to talk to him."  Hutton then confronted Mitchell, demanding the return of his sewing machine and accusing Mitchell of stealing some tires from Hutton's backyard.  Hutton said that he had hidden $750 in the sewing machine.

{¶ 6}   Mitchell denied taking the machine.  However, Hutton insisted that Mitchell had tried to sell it to a Mr. Evans.  Hutton demanded that Mitchell come with him to Evans's house to settle the issue. Hutton threatened to "f* * * [Mitchell] up" if Evans confirmed Mitchell's guilt.

{¶ 7}   Mitchell and Simmons got into the car.  Before pulling away from the curb, Hutton pointed the rifle into Simmons's side and said: "I don't appreciate you all breaking in my sister's house."

{¶ 8}   Instead of going to Evans's house, Hutton drove to a parking lot behind an RTA bus facility.  Hutton got out of the car and ordered Mitchell to get out as well. Hutton and Mitchell then walked a short distance from the car. Simmons could not hear their conversation, but he saw Hutton put a pistol against Mitchell's head.

{¶ 9}   Hutton and Mitchell returned to the car.  With Mitchell giving directions, Hutton drove to an area known as "the Projects."  Hutton and Mitchell went into a building and emerged after a few minutes with a white sewing-machine case.

{¶ 10} Hutton drove to his mother's house, took the case inside, and returned to the car. He then drove to the next street and pulled into an alley where a Cadillac El Dorado was parked. Hutton told Simmons that the El Dorado was the car he wanted to work on. Simmons got out of Hutton's car. Hutton then

moved his car to the other end of the street. Leaving Laster and Mitchell in the car, he walked back to the alley, where Simmons was waiting.

{¶ 11}   Hutton broke into the El Dorado with a screwdriver.  When Simmons got inside, Hutton opened the hood and told him to try starting the engine.  Hutton then walked back to Simmons, shot him twice in the back of the head, and ran up the alley.

{¶ 12}   Unable to move at first, lying half in and half out of the car, Simmons cried for help.  He managed to get up and stagger away in search of assistance.  Simmons went first to the nearby home of Hutton's mother, then to Mary Etta Pollard's house next door.  He banged on Pollard's front door and cried for help.  Then he heard Hutton's car coming out of the nearby alley.  He ran into Pollard's back yard and pounded on the back door, shouting that he had been shot.

{¶ 13}   Hutton drove up and stopped in front of Pollard's house.  He urged Simmons to "come here" or "come from back there."   Hutton noticed that Pollard's son[, Allen Pollard,] was looking out from his front door and told him to close the door. Simmons begged Hutton to take him to the hospital. Hutton said, "Just shut up and get in the car," and Simmons obeyed.  Mitchell and Bruce Laster were in the car with Hutton.

{¶ 14}   Telling Mitchell that some unknown assailant had shot Simmons, Hutton drove to St. Luke's Hospital.  Simmons asked Mitchell to go inside with him, but Mitchell said, "No.  We [are] going to get the mother-f* * *er that did this to you."

{¶ 15}   At 2:30 a.m., Mitchell, Hutton, and Laster returned to Mitchell's home.  They woke Mitchell's girlfriend, Eileen Sweeney, and took her to the hospital, where they dropped her off.  Sweeney went into the hospital to visit Simmons.  Telling her that Hutton had shot him, Simmons sent her to warn Mitchell to get out of the car.  She went outside, but the car was gone.

{¶ 16}   Hospital security officer Paul Whitcomb saw a Chrysler Cordoba drop Simmons off and leave "in a hurry."  About half an hour later, Whitcomb saw the same car drop off Sweeney.  After Sweeney went inside, Whitcomb saw the same car parked across the street from the hospital.  He sent security officer Gary Barnhard to get the license number.  As Barnhard drove past the car, he saw its two occupants crouch down in an attempt at concealment.  Then the car left.  A subsequent check of the license number disclosed that the gray Chrysler was registered to Hutton's fiancée, Celeste Laster.

{¶ 17}   Hutton and Bruce Laster later returned to the hospital without Mitchell.  Sweeney was still there.  Hutton told her that Mitchell was at home and offered to drive her back.  However, once he had Sweeney inside the car, Hutton took her to a park instead.  There, Hutton and Sweeney got out of the car.  Laster

then drove off, and Hutton proceeded to rape Sweeney. During the rape, Hutton told Sweeney that "Ricky wasn't coming back." According to Sweeney, Hutton had in his possession a small handgun with a white handle and a silver-colored barrel.

{¶ 18} When Laster returned with the car, Sweeney saw Hutton remove two rifles from the trunk and put them in the rear passenger compartment. Hutton then drove Sweeney home to the apartment she shared with Mitchell.

{¶ 19} When they arrived, Mitchell was not there. The door to the apartment had been damaged and the apartment was in disarray. Sweeney was too "scared and nervous" to drive, so Hutton drove her to the home of LaWanda Mitchell, the sister of Ricky Mitchell. Hutton followed Sweeney into LaWanda's house. According to Sweeney, Hutton told her that "Ricky [Mitchell] wasn't coming back," and that "if [she] told, someone would be looking for [her]."

{¶ 20} On Tuesday, September 17, Hutton drove to Indianapolis to enroll in a course for automotive mechanics at the Lincoln Technical Institute.

{¶ 21} On September 30, 1985, the body of Derek Mitchell was found near an intersection in Cleveland with a large tire lying on the body. An autopsy disclosed that Mitchell had been shot to death. Two .22-caliber long rifle bullets were recovered from the body; a firearms expert testified that these could have been fired from either a rifle or a handgun. The expert testified that the bullets that killed Mitchell had the same class characteristics as a bullet that had been removed from Simmons's head, but he could not tell whether all three had been fired from the same gun. The murder weapon was never found.

{¶ 22} The defense presented evidence that Mitchell was not killed on September 16, 1985, but at some later time while Hutton was in Indianapolis. Denise Richardson testified that she spoke to Mitchell at 3:00 p.m. on September 17, 1985, the day after the state claims Mitchell was murdered. According to Hutton, he was in Indianapolis at the time Richardson spoke to Mitchell. Hutton claimed that he stayed in Indianapolis until October 3, except for two brief visits to Cleveland on September 21 and 28. An employee of the Indianapolis YMCA saw Hutton there sometime after 4:00 p.m. on September 17. The YMCA employee testified that Hutton had paid rent for the period of September 17 through October 3.

{¶ 23} On October 4, 1985, Cleveland Police Detective Robert Moore spoke to Hutton on the telephone. Hutton agreed to return to Cleveland and surrender to Moore at a prearranged time and place. On October 5, Hutton surrendered.

{¶ 24} Hutton and Laster were jointly indicted on two counts of aggravated murder for killing Derek Mitchell. The first count charged that they

committed the murder with prior calculation and design. [O].R.C. 2903.01(A). The second charged them with murdering Mitchell while committing, attempting, or fleeing the commission or attempted commission of kidnapping. [O].R.C. 2903.01(B). Each murder count carried two capital specifications: a course-of-conduct specification, [O].R.C. 2929.04(A)(5), and a felony-murder kidnapping specification, [O].R.C. 2929.04(A)(7). Hutton and Laster were also indicted for kidnapping Mitchell and Simmons, and for the attempted murder of Simmons. Each count carried a firearm specification.

*State v. Hutton*, 797 N.E.2d 948, 952–55 (Ohio 2003).

### B. Procedural History

In 1986, an Ohio state jury convicted Hutton of aggravated murder (prior calculation and design), aggravated murder (felony-murder), two counts of kidnapping, and attempted murder, with a firearm specification attached to each count. Following the jury's recommendation, the trial court sentenced Hutton to death.

On direct appeal, the Court of Appeals for Cuyahoga County found several trial errors and set aside Hutton's convictions and sentence, but the Ohio Supreme Court reversed and remanded the case to the Ohio Court of Appeals to conduct an independent review of the appropriateness of the death sentence. *State v. Hutton*, No. 51704, 1988 WL 39276, at *31 (Ohio Ct. App. Apr. 28, 1988), *rev'd*, 559 N.E.2d 432, 447–48 (Ohio 1990). On remand, the Court of Appeals determined that the death sentence was appropriate. *State v. Hutton*, 594 N.E.2d 692, 695 (Ohio Ct. App. 1991). Hutton did not appeal that decision.

In September 1996, Hutton filed a petition for post-conviction relief in state trial court, but the court denied him relief without an evidentiary hearing. The Ohio Court of Appeals affirmed. *State v. Hutton*, No. 76348, 2004 WL 1575248, at *3 (Ohio Ct. App. July 15, 2004). The Ohio Supreme Court declined further review. *State v. Hutton*, 819 N.E.2d 709 (Ohio 2004) (table).

In October 2000, Hutton's motion for delayed appeal was granted. *State v. Hutton*, 736 N.E.2d 903, 903 (Ohio 2000) (table). In February 2001, Hutton unsuccessfully filed a second petition for post-conviction relief. *State v. Hutton*, No. 80763, 2007 WL 2955663, at *3 (Ohio Ct. App. Oct. 11, 2007). The Ohio Supreme Court again declined further review. *State v.*

*Hutton*, 883 N.E.2d 457, 457 (Ohio 2008) (table). Pursuant to Ohio Rule of Appellate Procedure 26(B), Hutton applied to reopen his direct appeal, contending ineffective assistance of appellate counsel, but the Ohio Court of Appeals denied the application. *State v. Hutton*, No. 51704, 2000 WL 301097, at *2 (Ohio Ct. App. Mar. 20, 2000), *aff'd*, 797 N.E.2d 948, 964 (Ohio 2003).

### C. Federal Habeas Procedural Facts

In December 2005, Hutton filed a petition for a writ of habeas corpus in federal district court. In June 2011, Hutton amended his petition, asserting thirteen grounds for relief. Without conducting an evidentiary hearing, the district court denied habeas corpus relief but certified four of the thirteen claims for appellate review. (R. 67.) This Court expanded the certification to include two additional claims. Accordingly, we address each of Hutton's claims in turn.

### II.

We review de novo a district court's denial of a habeas petition, particularly the determinations involving matters of law or mixed questions of law and fact, and we review for clear error the factual determinations. *Gumm v. Mitchell*, 775 F.3d 345, 359–60 (6th Cir. 2014). Hutton filed his habeas petition in 2005; thus, it is subject to the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which became effective on April 24, 1996. *See Keeling v. Warden*, 673 F.3d 452, 458 (6th Cir. 2012).

Under AEDPA, a writ may not be granted unless the state court's adjudication of the claim

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). A federal habeas court may grant the writ under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts." *Van Tran v. Colson*, 764 F.3d 594, 604 (6th Cir. 2014)

(citing *Brown v. Payton*, 544 U.S. 133, 141 (2005)). The habeas petitioner has the burden of rebutting, by clear and convincing evidence, the presumption that the state court's factual findings were correct. *Id.* (citing 28 U.S.C. § 2254(e)(1)).

## A.

First, we turn to Hutton's claim that the trial court failed to instruct the jury on the list of "aggravating circumstances." The Ohio statutory sentencing scheme for the death penalty requires more than a finding of guilt; it also requires the jury to make a finding of aggravating circumstances. The jury must then conclude that the aggravating circumstances outweigh the mitigating circumstances to impose the death penalty. O.R.C. § 2929.04(A).

In Hutton's case, while the jury instructions listed the seven *mitigating* circumstances, they neglected to define or list the "aggravating circumstances."[1] Thus, there was no indication

---

[1]The full text of the jury instructions is as follows:

The COURT: Ladies and gentlemen, you have now heard all the evidence and the arguments of counsel, and you will now decide whether you will recommend to the Court that the sentence of death shall be imposed upon the Defendant, and if not whether you will recommend that the Defendant be sentenced to life imprisonment with a parole eligibility after serving 20 full years of imprisonment, or to life imprisonment with parole eligibility after serving 30 full years of imprisonment.

You will consider all the evidence, arguments, statements of the Defendant, pre-sentence investigation, mental examination report, and all other information and reports which are relevant to the nature and circumstances of any mitigating factors, including but not limited to the nature and background of the Defendant, and all of the following:

1. Whether the victim of the offense induced or facilitated.
2. Whether it is unlikely that the offense would have been committed but for the fact that the offender was under duress, coercion or strong provocation.
3. Whether at the time of the committing of the offense the Defendant, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirement of the law.
4. The youth of the Defendant.
5. The Defendant's lack of significant history of prior criminal convictions and delinquency adjudications.
6. If the Defendant was a participant in the offense, but not the principal offender, the degree of the Defendant's participation in the offense and the degree of the Defendant's participation in the acts that led to the death of the victim.
7. Any other factors that are relevant to the issue of whether the Defendant should be sentenced to death.

The prosecution has the burden to prove beyond a reasonable doubt that the aggravating circumstances, of which the Defendant was found guilty, outweigh the factors in mitigation of imposing the death sentence.

To outweigh means to weigh more than, to be more important than.

in the jury instructions which aggravating circumstances the jury could review to make a recommendation.  (Pet.'s Br. 46.)  However, Hutton's trial counsel never objected to the instruction, failing to preserve the claim on appeal.

In fact, the error was first discovered on review by the Ohio Supreme Court, during which the majority acknowledged the error in a footnote and Judge Brown based his partial dissent on the error.[2]  *Hutton*, 559 N.E. 2d 432, 449 n.1 (Ohio 1990) ("We observe that the trial court did not instruct the jury in the penalty phase as to what the aggravating circumstances were.").  The Ohio Supreme Court determined that Hutton had waived the claim since Hutton failed to address it in his briefs.

Asserting *Gregg v. Georgia*, Hutton claims that the trial court violated his due process rights in causing the jury to have "untrammeled discretion" to sentence him.  428 U.S. 153 (1976) (finding that a defendant's Eighth Amendment rights are violated where the jury is left with "untrammeled discretion" to impose the death penalty).  The district court likewise found that the claim had been procedurally defaulted because of Hutton's failure to raise it on appeal. (R. 67, PageID 1704.)  In the alternative, the district court found that the claim was meritless because the Ohio Court of Appeals cured any possible error through its independent reweighing. (*Id*. at 1704–06.)  In making this decision, the district court largely relied upon our decision in

---

The existence of mitigating factors does not preclude or prevent the death sentence.  If the aggravating circumstances outweigh the mitigating factors.

You are, of course, mindful of the definition given you earlier by the Court of the phrase reasonable doubt, and I will share that with you again.  Reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charges.

Reasonable doubt is a doubt based on reason and common sense.  Reasonable doubt is not mere possible doubt because everything relating to human affairs or depending on moral judgment is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs.

You should recommend the sentence of death if you unanimously, that is all twelve of you, find proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.

If you do not so find, you should unanimously recommend either life sentence with parole eligibility after serving 20 years of imprisonment or life sentence with parole eligibility after serving 30 years of imprisonment.

[2] "[B]ecause the sentencing phase of the trial was marred by a plain error in the jury instructions, I must respectfully dissent from the remand for review of the death sentence." *State v. Hutton*, 559 N.E.2d 432, 449 (Ohio 1990) (Brown, J., dissenting in part.).

*Hoffner*. (*Id.*) In *Hoffner*, however, we relied on the Ohio Supreme Court's adjudication of *this* case. 622 F.3d at 506 (applying the reasoning in *State v. Hutton*, 797 N.E.2d at 958-59 (Ohio 2003), to the petitioner's claim). If we were to rely solely on the ruling in *Hoffner*, we would be applying a circular analysis—i.e., we would be finding that any state trial court error in Hutton's case was cured because the Ohio Supreme Court found that the error was cured. This would abdicate our role as judges to independently review the case before us.

As to the procedural default issue, the Supreme Court has made it explicitly clear that when a "state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice . . . , *or* demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (emphasis added).

In determining whether a federal claim has been procedurally defaulted, we apply the test initially laid out in *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). We first consider whether there is an applicable state procedural rule with which the petitioner failed to comply. *Id.* Second, we decide whether the state courts actually enforced the state procedural sanction. *Id.* Third, we determine whether the state procedural rule is an "adequate and independent" state ground on which the state can foreclose review of a federal constitutional claim. *Id.* Fourth, the petitioner must demonstrate that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.*

It is clear that Hutton defaulted this claim. In Ohio, when a party fails to contemporaneously object to an error, the error is deemed waived. Ohio R. Crim. P. 52. Pursuant to Ohio's contemporaneous objection rule, Ohio courts treat the failure to object as a procedural default. *Scott v. Mitchell*, 209 F.3d 854, 866 (6th Cir. 2000). The United States Supreme Court has specifically found that a default imposed for failure to object contemporaneously is an adequate and independent state ground barring federal habeas review absent a showing of cause and prejudice. *Id.* at 867 (citing *Engle v. Isaac*, 456 U.S. 107, 124–29

(1982)). Consequently, because Hutton failed to object to the omission in the jury instructions during trial, he procedurally defaulted his claim.**3**

Where a petitioner cannot demonstrate the "cause and prejudice" necessary to overcome a procedural default, a court may reach the merits of a procedurally defaulted claim where review of the claim is necessary to correct or avoid a "fundamental miscarriage of justice." *See Murray v. Carrier*, 477 U.S. 478, 496 (1986) (finding that where a constitutional violation likely resulted in the miscarriage of justice, a federal court may grant habeas relief even in the absence of a showing of cause to overcome a procedural default). We first acknowledge, as the dissent points out, that Hutton did not raise this claim in his opening brief and it is, therefore, considered waived. As a general rule, this Court will not consider arguments not presented in a party's opening brief. *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006) (noting that "'an appellant abandons all issues not raised and argued in its initial brief on appeal.'") (citations omitted). However, because this rule is procedural and not jurisdictional, the Court may excuse a default if the interest of justice so requires. *See Thomas v. Arn*, 475 U.S. 140, 155 (1985); *United States v. Lawrence*, 735 F.3d 385, 430–31 (6th Cir. 2013).

The Supreme Court has extended fundamental miscarriage of justice in capital cases to mean actual innocence of the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333, 347 (1992). "[T]o show 'actual innocence' one must show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have found the petitioner eligible for the death penalty under the applicable state law." *Id*. at 336. This "actual innocence" standard must focus on the elements that render a defendant eligible for the death penalty. *Id.* at 347. Despite the important interests served by state procedural rules, we cannot permit finality alone to provide a sufficient reason for federal courts to compromise their protection of constitutional rights under § 2254. *See Reed v. Ross*, 468 U.S. 1, 15 (1984). In short, barring all procedurally defaulted

---

**3**It should be well noted that Ohio law allows review of an unpreserved claim under the plain error standard. *See State v. Long*, 372 N.E.2d 804, 806–07 (Ohio 1978). The basic inquiry in Ohio's plain error analysis is whether the defendant has been denied a "fair trial." *Scott*, 209 F.3d at 866. In determining that Hutton procedurally defaulted this claim, the Ohio Supreme Court did not analyze the constitutional challenge to the jury instructions on its merits, nor did it apply plain-error review when it noted the absence of a contemporaneous objection to the instruction. *See Hutton*, 797 N.E.2d at 959. Rather, the court merely ruled that Hutton's failure to object at trial operates as a procedural default.

claims is not the standard. *See Scott*, 209 F.3d at 866. Relevant here, a criminal defendant has a right to expect that the trial court will give complete and correct jury instructions. *State v. Williford*, 551 N.E.2d 1279, 1283 (Ohio 1990). If there was a fundamental miscarriage of justice in imposing a death sentence, we may find that the petitioner overcame the procedural default.

Pursuant to O.R.C. § 2929.05(A), for death sentences, the Ohio Court of Appeals may independently determine whether (1) the record supports the jury's finding of the existence of aggravating circumstances; (2) the aggravating circumstances outweigh any mitigating circumstances; (3) trial court properly weighed the aggravating circumstances against the mitigating circumstances; (4) the sentence of death is not disproportionate to the penalty imposed in similar cases; and (5) the sentence of death is consequently appropriate.

Most relevant here is that, at the time the Ohio Court of Appeals independently reweighed the factors, the jury had not made the necessary finding of the existence of aggravating circumstances. Thus, the jury could not have determined that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt without knowing what the aggravating circumstances were. (Pet.'s Br. 43–44.) Without this finding, a death sentence cannot stand. Since the jury did not make the necessary aggravating circumstances finding, Hutton argues that the Ohio Court of Appeals made its own finding of the existence of aggravating circumstances, which the Supreme Court has repeatedly ruled as unconstitutional. (*Id.*)

In *Hurst v. Florida*, 136 S. Ct. 616, 619 (2016), the Supreme Court reiterated that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." Relying on *Ring v. Arizona*, 536 U.S. 584 (2002), the Supreme Court rejected the sentencing scheme in *Hurst* at issue because the court—and not the jury—ultimately made the "critical findings" about both "the existence and weight of aggravating circumstances" necessary to impose a death sentence. *Hurst*, 136 S. Ct. at 621.

In *Ring*, the Supreme Court rejected Arizona's capital sentencing scheme because the statute allowed a judge to find the facts necessary to sentence a defendant to death. Under state law, Ring could not be sentenced to death without the finding of at least one aggravating

circumstance. *Id.* at 592. The Supreme Court concluded that a state court judge's finding of an aggravating circumstance exposed Ring to greater punishment than that authorized by the jury's guilty verdict. *Id.* at 597. Had the judge not engaged in any fact finding, Ring would have received a life sentence. *Id.* Thus, the Court ruled that Ring's death sentence violated his right to have a jury find the facts necessary to impose punishment. *Id.* In large part, this was because the Court found that judicial fact finding for aggravating circumstances under certain state sentencing schemes runs afoul of the rule in *Apprendi*, which states that any fact that "expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict" is an "element" that must be submitted to a jury. *Apprendi v. New Jersey*, 530 U.S. 466, 494 (2000).

To be clear, the Supreme Court has also held that where a state appellate court conducts an independent review of the record, reweighs the mitigating and aggravating circumstances, and concludes that the death penalty was warranted, the Federal Constitution does not prevent a court from upholding that death sentence even though it was based in part on an invalid or improperly defined aggravating circumstance. *Clemons v. Mississippi*, 494 U.S. 738, 741, 750 (1990). In fact, we have held that "[c]onsideration of a non-statutory aggravating circumstance, even if contrary to state law, does not violate the Constitution." *Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003) (citing *Barclay*, 463 U.S. at 956–58).

However, *Clemons* and this case are significantly distinguishable in two ways. First, in *Clemons*, only one or two invalidated aggravating circumstances were at issue, which means that the jury in *Clemons* was still given a list of *valid* aggravating circumstances to guide its decision. 494 U.S. at 741. Even though the finding turned out to be an erroneous one, the jury in *Clemons* was given guidance in making a finding as to what aggravating circumstances existed or applied to the defendant's case. *Id.* Second, in reweighing the circumstances in *Clemons*, the state appellate court knew what the jury considered regarding aggravating circumstances before reweighing the circumstances found by the jury. Reweighing in *Clemons* only required eliminating one or two aggravating circumstances but, arguably, the finding that the aggravating circumstances outweighed the mitigating circumstances was still largely valid because it was based on the jury's consideration of valid circumstances. *Id.* at 744.

By contrast, here, the jury was not given an *improperly* defined aggravated circumstance. Instead, the court gave the jury no guidance as to what to consider as aggravating circumstances. Second, the jury was precluded from making the necessary findings of aggravating circumstances *in the first place*. There is nothing in the record that indicates that the jury's finding that the aggravating circumstances outweighed the mitigating ones was actually based on a review of any valid aggravating circumstances.

Thus, the analysis of the *Gregg* and *Ring* courts more aptly apply to Hutton's sentence. Hutton's death sentence was imposed by a judge's factual finding—not the jury's. Evidently, not wishing to permit appellate reweighing for every trial court's error, the *Clemons* Court specified that in "some situations," where there are "peculiarities" that make appellate reweighing speculative or impossible, reweighing may not cure the error. *Id.* at 754.

Because a death sentence in Ohio cannot be imposed without an aggravating-circumstances finding, we need not consider at length whether a fundamental miscarriage of justice resulted from the failure to define "aggravating circumstances" in the jury instructions. It clearly did, as the jury, without proper instructions, could not have made a finding that aggravating circumstances existed; thus, the harshest sentence Hutton could possibly have received without that instruction was life—not death. To find otherwise renders due process rights illusory. Thus, Hutton demonstrates a fundamental miscarriage of justice sufficient to overcome the procedural default of his first claim.

As previously mentioned, under AEDPA, the Court is required to defer to the state court's merits determination of a claim. *See* 28 U.S.C. § 2254(d). However, in the absence of a state-court determination on the merits of a claim, AEDPA's deferential standard has no application, and the Court reviews the claim de novo. *Henley v. Bell*, 487 F.3d 379, 390 (6th Cir. 2007) (citing *Linscott v. Rose*, 436 F.3d 587, 592 (6th Cir. 2006)). The Supreme Court's long-standing precedent in *Apprendi*, *Ring*, and *Gregg* establish that Hutton's constitutional rights were violated. Therefore, we are compelled by precedent to find that the Ohio Court of Appeals' findings of aggravating circumstances were not valid to permit a death sentence to stand.

**B.**

Hutton's second assignment of error is that Hutton's appellate counsel was ineffective for two reasons: first, counsel did not raise the claim based on the trial court's failure to define "aggravating circumstances" in the jury instructions, and second, counsel did not argue that trial counsel was ineffective for failing to object to the erroneous jury instructions. Because the Ohio Supreme Court adjudicated this claim on the merits, *see Hutton*, 797 N.E.2d at 958–59, AEDPA applies to this claim.

Allegations of ineffective assistance of counsel are considered in two parts. First, we must determine whether the challenged act or omission fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Second, we must decide whether the defendant was prejudiced, such that there is a reasonable probability that, but for counsel's errors, the sentence would have been different. *Id.*

While we ordinarily presume that counsel's conduct falls within the range of reasonable professional assistance, *id.* at 691, we do not require appellate counsel to raise every possible issue in order to render constitutionally effective assistance, see *Jones v. Barnes*, 463 U.S. 745, 750–53 (1983). Generally, only when omitted arguments are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome. *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

Although the district court focused on the second *Strickland* prong, the court does not need to reach that issue because counsel's performance was likely not deficient. *See Strickland*, 466 U.S. at 697 (finding that a court need not address both components of the inquiry if the defendant makes an insufficient showing on one). We cannot conclude here that the two omitted arguments were "clearly stronger" than the other claims his counsel presented on direct appeal, five for which the Ohio Court of Appeals granted relief. Given the vacated sentence Hutton's counsel obtained for his client on direct appeal, Hutton cannot reasonably prove that his appellate counsel was deficient. Therefore, this claim fails.

**C.**

Under the third assignment of error, Hutton contends that the trial court's admission of Eileen Sweeney's testimony that he raped her denied him due process. (Pet.'s Br. 51–62.) Hutton argues that Sweeney's testimony was improper because Hutton had not been charged with rape and that the allegation bore no probative value to the murder and kidnapping charges. (R. 16-25, PageID 6528–29.) When Hutton raised this claim on direct appeal, the Ohio Court of Appeals granted relief, finding that "the jury received this damaging testimony over Appellant's objection and improperly considered it as further proof of the Appellant's commission of the aggravated and attempted murders and kidnappings." *Hutton*, 1988 WL 39276, at *22. The Ohio Supreme Court acknowledged the erroneous admission but reversed the court of appeals, deeming the error harmless because overwhelmingly strong evidence supported the murder and kidnapping convictions. *Hutton*, 559 N.E.2d at 440. Hutton also raised the claim on state post-conviction review and was subsequently barred by res judicata. The district court likewise denied Hutton habeas relief, stating that "Hutton has not explained how the Ohio Supreme Court 'used an improper standard to determine the error to be harmless'" as "it examined the 'other admissible evidence, standing alone,' and found it to 'constitute[] overwhelming proof of guilt.'" (R. 67, Page ID 1703).

We agree. We review the admission for harmless error, assessing the alleged prejudicial impact under the "substantial and injurious effect" standard as established in *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). To warrant habeas relief, a questionable evidentiary admission must not only be erroneous, but it must also be so infirm that it rendered the trial fundamentally unfair, such that it had influence in determining the jury's verdict. *See Coe v. Bell*, 161 F.3d 320, 329 (6th Cir. 1998); *see also McCarley v. Kelly*, 801 F.3d 652, 665 (6th Cir. 2015). The *Brecht* test subsumes the limitations imposed by AEDPA. *McCarley*, 801 F.3d at 665 (citing *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015)).

Hutton cannot show a substantial and injurious effect. In an effort to minimize the prejudicial impact of the testimony, the court gave the jury a limiting instruction admonishing the jury to refrain from considering the testimony "in any way, shape or form with respect to the determination of guilt or innocence" with regard to Hutton's charges. (R. 16-25, PageID 6531.)

Hutton has not indicated how the state's adjudication of the claim was contrary to clearly established law. Notwithstanding the rape testimony, the record still contains strong circumstantial evidence that connects Hutton to the crime, such that the erroneous admission likely did not determine the jury's verdict. *Cf. Ford v. Curtis*, 277 F.3d 806, 810–11 (6th Cir. 2002). Accordingly, the state court's disposition of the claim was neither unreasonable nor contrary to precedent. Hutton is not entitled to habeas relief on this ground.

**D.**

In Hutton's fourth assignment of error, Hutton contends that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding statements made to the police by Bernard Holloway and Kim Lampkin. (Pet.'s Br. 62.) However, Hutton raised this claim for the first time in his petition for post-conviction review. (R. 60, Page ID 1339.) The district court accordingly determined that the claim related to Holloway and Lampkin was procedurally defaulted because it was not raised in the state courts. (R. 67, Page ID 1681.) Notwithstanding the default, the district court still reviewed the merits of the claim and found that Hutton failed to meet the first two prongs of the *Brady* test. (R. 67, Page ID 1681–82.)

To overcome the default, Hutton had to establish cause and prejudice, which can be established by merely establishing the merits of his *Brady* claim. *See Strickler v. Greene*, 527 U.S. 263, 282 (1999) ("In this case, cause and prejudice parallel two of the three components of the alleged *Brady* violation itself.") To do so, Hutton must show that "(1) the evidence was favorable to him, (2) the prosecutor withheld the evidence, and (3) he suffered prejudice, which means that the suppressed evidence is material either to his conviction or his sentence." *Jones v. Bagley*, 696 F.3d 475, 486 (6th Cir. 2012) (citing *Strickler*, 527 U.S. at 280-82). Favorable evidence can only be "material" under *Brady* if a reasonable probability exists that, had the evidence been disclosed, the result of the proceeding would have been different. *Henness v. Bagley*, 644 F.3d 308, 324 (6th Cir. 2011) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)).

### i. Holloway's Statement

Holloway testified at trial that after Mitchell went missing, Hutton told Holloway that Mitchell and Simmons had been robbing numbers houses. In a withheld police report, Holloway mentioned only Simmons robbing the numbers houses.

Hutton contends that Holloway's withheld statement was material because Holloway "clearly implied in his trial testimony that Mr. Hutton told him about Mitchell and Simmons robbing the numbers house as a ruse to point suspicion for the murder towards the numbers people and away from himself." (Pet.'s Br. 64.) Hutton also argues that Holloway's withheld statement was a prior inconsistent statement that he could have used to impeach Holloway. However, neither statement would have "resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles v. Whitley*, 514 U.S. 419, 441 (1995). Holloway's statements made to police did not corroborate anything materially different from the testimony offered by Simmons, Jr. and Hutton, and the circumstantial evidence of the case. The record reveals that Holloway, in his testimony, primarily stated details about Hutton's visit to Holloway and Simmons' apartment, and Hutton's communication with Mitchell and Simmons, Jr. about the sewing machine, a matter about which Holloway knew little.

Further, even if cause was established by Holloway's two inconsistent statements as to who Hutton said was involved in the alleged robbery of a "numbers house," Hutton still cannot show how he was prejudiced. Holloway testified on direct examination that he had been convicted of a "[s]tate drug law violation." Consequently, credibility may have been an issue for him. *See Byrd v. Collins*, 209 F.3d 486, 502 (6th Cir. 2000) (identifying a criminal conviction resulting in incarceration for more than one year as impeachment evidence); Ohio Evid. R. 609(A). Moreover, to the extent that Holloway's testimony corroborated Simmons, Jr.'s testimony, that corroboration was limited to testimony about when Hutton visited Holloway's apartment before the shooting of Simmons, which Hutton acknowledged in his own testimony. Hutton cannot demonstrate that a different outcome would have resulted had the prosecution disclosed Holloway's statement to the police.

**ii.** **Lampkin's Statement**

At trial, Lampkin testified that she knew Hutton and that after Simmons was shot, she became scared of Hutton and moved away. In a police statement that the prosecution never gave to Hutton, however, Lampkin said that she did not know Hutton.

Hutton argues that Lampkin's withheld statement was important for impeachment purposes because in her testimony, she implied that she was afraid of Mr. Hutton. However, this material would not have made his case markedly stronger. Any potential impeachment of Lampkin would not have produced a different result. Therefore, the claim fails.

**E.**

Under Hutton's fifth assignment of error, Hutton contends that trial counsel was ineffective for failing to investigate and present available mitigation evidence. Specifically, he claims that his trial counsel was constitutionally ineffective during the guilt phase of the trial for failing to adequately consider and evaluate mitigating facts concerning (1) Hutton's neighbor, Allen Pollard; (2) Simmons, Sr.'s encounter with three men who were looking for Simmons, Jr. on the night of the shooting; (3) the likelihood of Simmons, Jr. owing money to a drug dealer at the time of the shooting due to his drug usage; and (4) information that the sewing machine belonged to Sharon Booker, and not Hutton's sister. He contends that further investigation would have changed the outcome of the trial.

Hutton raised the claim during the first state post-conviction proceedings, but the trial court applied res judicata as a procedural bar, reasoning that Hutton could have raised the claim on direct appeal but did not and therefore defaulted the claim. The trial court still reviewed the claim on its merits and found that he did not sufficiently demonstrate deficient performance under *Strickland*. The district court, on federal habeas corpus review, likewise imposed a procedural bar and found that the claim did not entitle Hutton to habeas relief. (R. 67 PageID 1637–40.)

Under Ohio's res judicata doctrine, a defendant may not raise a claim in a post-conviction proceeding that either could have been or actually was fully litigated at trial or on direct appeal.

*Hanna v. Ishee*, 694 F.3d 596, 614 (6th Cir. 2012).  Ohio courts permit an exception where the defendant can establish an ineffective assistance of counsel claim based on references to evidence that are outside the record on direct appeal.  *Id.*

Therefore, as with Hutton's other ineffective assistance claim, to overcome the procedural bar, Hutton must show deficient performance and prejudice, and that the state court's resolution of the claim was unreasonable.  *Loza v. Mitchell*, 766 F.3d 466, 487 (6th Cir. 2014).  First, concerning the alleged failure to interview Allen Pollard, the district court found that his testimony would have been cumulative of that offered at trial by his mother, Mary Pollard. (R. 67, PageID 1651.)  Mary Pollard testified on the prosecution's behalf about events that occurred near her home on the night of the murder and how she was neighbors to Hutton and his mother.  She also testified that after her husband left for work at midnight, she was upstairs in her room when she heard "a lot of knocking next door to me on the [side of the] Hutton's, like bamming on the door, bam, bam, bam."  (R. 16-26, PageID 6927–28.)  She testified that she heard a person yelling, "I'm shot.  I'm shot."  (R. 16-26, PageID 6929.)  Then, as she described, someone began to knock on her door yelling, "I'm shot.  I'm shot."  (R. 16-26, PageID 6929.)

Although she testified that Allen was downstairs when the knocking started and that Allen reached the front door before she did, she made it clear that neither she nor Allen left the house.  (*Id.*)  Mary Pollard's testimony further revealed—in mitigating form—that Sam Simmons left her yard when he heard Hutton driving by and acted "[l]ike he was glad to see" him.  (R . 16-26, PageID 6941–42.)  It was reasonable for the court to find that Allen's account of what happened that night was no different from the account his mother provided in trial.

Second, Hutton claimed that his trial counsel was ineffective for failing to investigate information provided by Simmons, Sr. that three men visited his home and asked where they could find Simmons, Jr.  (Pet.'s Br. 73.)  However, Hutton fails to explain how Simmons, Sr.'s encounter with the three men was relevant to his defense or how his counsel's decision to not use it prejudiced him.  (R. 67, PageID 1648.)  Therefore, he fails to demonstrate deficient performance and prejudice.  Nor can Hutton do so with respect to his claim that counsel should have investigated witnesses to establish that the sewing machine belonged to Sharon Booker. That fact was proved at trial by Hutton's testimony.

Last, Hutton contends that trial counsel should have investigated Simmons, Jr.'s drug use and relationship with Mitchell. (Pet.'s Br. 74.) Despite Hutton's submission of four individual affidavits, the evidence presented at trial concerning Simmons, Jr.'s possible drug use was stronger. For instance, at trial, the jury heard testimony from the surgical resident who examined Simmons, Jr. in the emergency room after he was shot and who indicated that Simmons, Jr. was likely using drugs. (R. 67, PageID 1648–50.)

Therefore, each asserted claim fails to establish a claim for ineffective assistance of counsel. The state court's rejection of this claim was not contrary to clearly established law nor did it involve an unreasonable application of clearly established law.

**F.**

Last, Hutton contends that trial counsel was ineffective because counsel did not object to the prosecution's use of Hutton's juvenile record as well as the prosecution's reference to a prior homicide conviction that had been overturned. (Pet.'s Br. 77; R. 16-29, PageID 7751.) Because trial counsel did not object, the Ohio Supreme Court reviewed the claim for plain error and found that none existed. *Id.* The state supreme court first found that "the [juvenile] record was part of the [presentence report] and therefore subject to fair comment by the prosecutor. Merely reading excerpts from the [presentence report] to the jury was not objectionable." *Hutton*, 559 N.E.2d at 446. As such, the court did not find any ineffective assistance of counsel. *Id.* The court, however, found that the prosecutor's comments to the jury that the prior murder conviction had been reversed were improper because this evidence was not contained in the presentence report. *Id.* at 442. But the court did not address the claim that trial counsel was ineffective for failing to object to these comments.

On federal habeas corpus review, the district court denied the ineffective assistance claim, finding that the Ohio Supreme Court's resolution was neither unreasonable nor contrary to clearly established law. We agree. We have noted that "[b]ecause the decision to object in a particular instance is made in the strategic context of an entire trial, any single failure to object does not constitute error unless the information introduced 'is so prejudicial to a client that failure to object essentially defaults the case to the state.'" *Hodge v. Haeberlin*, 579 F.3d 627,

649 (6th Cir. 2009). Although trial counsel did not object to the prosecutor's comments, he clarified in his closing argument which conviction had actually been overturned, and the circumstances giving rise to the charged offenses. (R. 16-29, PageID 7754–55.) As with the other ineffective assistance claims, Hutton cannot establish prejudice proving that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Darden v. Wainwright*, 477 U.S. 168, 184 (1986).

## III.

Accordingly, we **REVERSE** the judgment of the district court and **CONDITIONALLY GRANT** habeas relief based on the first assignment of error, rejecting the remainder. We **REMAND** the case to the district court with instructions to order Hutton's release from custody unless the state grants a new sentencing hearing within 180 days from the date that the mandate issues from this Court.

———————————

**CONCURRENCE**

———————————

MERRITT, Circuit Judge, concurring.  I do not agree with my colleagues' procedural ruling that the Eighth Amendment claim in this case has not been decided by the Ohio Supreme Court on the merits but rather is procedurally defaulted.  My colleagues appear to believe that we cannot review the merits of this claim directly in habeas corpus—due to a procedural default that kept the Ohio Supreme Court from reviewing it on the merits.  On page 10 of her opinion, Judge Donald says, "Hutton defaulted this claim."  Judge Rogers makes the same statement in the first paragraph of his dissenting opinion.  My reasoning is that the Eighth Amendment claim, although not presented by Hutton's ineffective appellate counsel on direct appeal, was clearly and persuasively presented by three dissenting members of the Ohio Supreme Court.  The full Ohio Supreme Court had clear notice of the issue.  The habeas law on this subject appears to be that a state court is "presumed" to decide the merits of a federal issue when, as here, it has indisputable notice of the question explained by three members as decisive.  In these circumstances, the state court cannot be regarded as not having ruled on the merits when it remains silent.  In this case silence speaks volumes.  The Supreme Court has held many times that

> when a state court issues an order that summarily rejects without discussion *all* the claims raised by a defendant, including a federal claim that the defendant subsequently presses in a federal habeas proceeding, the federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits.

*Johnson v. Williams*, 133 S. Ct. 1088, 1091 (2013) (citing *Harrington v. Richter*, 562 U.S. 86, 98-99 (2011)).  If we are to adhere to *Johnson* and *Richter*, it makes no sense at all to create additional hurdles for Hutton to jump by ruling that the Ohio Supreme Court did not rule on the Eighth Amendment issue that three dissenting justices discussed at length as an obvious constitutional error.  Although it is unclear why the Ohio Supreme Court majority did not respond to the dissenting justices' very clear, constitutional argument, it is clear, as the court acknowledged in a subsequent opinion in 2003, that the point was before the court.  In upholding the death penalty, the majority simply chose to remain silent on the issue in order to avoid

reversing the death penalty. Therefore, we must assume that the Ohio Supreme Court was aware of the issue and ruled against Hutton on the Eighth Amendment issue.

## I. Hutton's Penalty Phase Invalid under Eighth Amendment

Three dissenting justices on the Ohio Supreme Court said that the imposition of the death penalty in this case is clearly unconstitutional under the Eighth Amendment and that the issue must be reached and decided. Of the seven members of the Ohio Supreme Court when the case was decided on direct appeal in 1990, three wrote an opinion upholding the death penalty in Hutton's case, one concurred in the result, and three dissented. The three dissenters wrote that the imposition of the death penalty here clearly violated the basic doctrinal requirement of *Gregg v. Georgia*, 428 U.S. 153, 196 (1976), that specific "aggravators" be present in the case and explicitly defined by the trial court and explained to the jury as the aggravating factors to be weighed by the jury against mitigating evidence.

After ruling the death penalty unconstitutional in *Furman v. Georgia*, 408 U.S. 238 (1972), the Supreme Court in *Gregg* reconsidered and required a capital sentencing system in which the jury must find "aggravating" factors in addition to simple murder and in which the trial court *must instruct the jury as to the process of weighing specific aggravators against mitigating evidence.*[1] The dissenting justices in Hutton's case noted that there were no such qualifying aggravator-mitigator instructions at Hutton's capital sentencing trial and that the capital sentencing proceeding clearly violated constitutional standards:

> Without any instruction [at sentencing] defining "aggravating circumstances," the jury was left "with untrammeled discretion to impose or withhold the death penalty." *Gregg v. Georgia* (1976), 428 U.S. 153, 196, at fn. 47, 96 S. Ct. 2909, 2936, at fn. 47, 49 L. Ed. 2d 859. This, the United States Constitution forbids.

*State v. Hutton*, 559 N.E.2d 432, 449 (1990).

---

[1] The finding of the here-undefined aggravators must be made by the jurors, not by the court or the prosecutor. The Supreme Court has subsequently held that this jury requirement includes the finding that the found aggravators outweigh the mitigators. *Hurst v. Florida*, 136 S. Ct. 616 (2016). This entire process did not occur in the trial in this case in 1986 — in part because apparently neither defense counsel nor the trial judge understood the basic Eighth Amendment "aggravator" requirement for imposing capital punishment.

The three dissenters explained the situation at trial as follows:

The trial court's instructions to the jury correctly explained that the jury was required to weigh the aggravating circumstances against the mitigating factors, and could impose a sentence of death only if the aggravating circumstances outweighed the mitigating factors. Unfortunately, the court failed to tell the jury what the "aggravating circumstances" were.

….

No jury (or anyone else) can weigh aggravating circumstances against mitigating factors without knowing what the aggravating circumstances are. This weighing process is the very purpose of the sentencing phase of a capital trial.

*Id*. at 448-49.

The three dissenting justices also found that "defendant's counsel did not object at trial" to this constitutional error, an error that was so obvious after the *Gregg* case that the justices found it to be "plain error" on the part of counsel and the lower court. As stated above, the three justices who joined the single justice concurring in the result to make a majority simply did not discuss this Eighth Amendment issue at all. They simply remained silent on the issue. Although the majority did discuss ineffective assistance of counsel on several other points, they avoided any discussion of whether trial counsel should have raised this issue that the dissenters viewed as so obvious as to be "plain error." Under such circumstances, we must presume that the majority of the Ohio court rejected the Eighth Amendment issue 4-3.

In the Ohio Supreme Court's second opinion delivered in 2003 after a remand, it clearly mentioned the fact that the trial court failed to define the "aggravating circumstances" and itself suggested the possibility of "plain error." But then instead of deciding the Eighth Amendment question based on plain error, as found by their dissenting colleagues in the earlier opinion, the Ohio Supreme Court again simply did not discuss the question further. It immediately shifted its focus and treated the constitutional problem as a Sixth Amendment issue of ineffective assistance of counsel. Skipping over the Eighth Amendment issue that the three dissenting justices had decided in favor of Hutton, the Ohio Supreme Court simply concluded without elaboration: "Failure to raise the waived instructional issue was not deficient performance constituting ineffective assistance of counsel." *State v. Hutton*, 797 N.E.2d 948, 959 (2003).

## II. Ineffective Assistance of Counsel

Federal judges should not go out of their way to foreclose and prevent themselves from reaching the merits of a constitutional issue that must be decided in favor of the accused if reached—especially in a death case. That is the case here. No one can claim here that Hutton did receive a fair trial, as the dissenting Ohio justices make clear. If federal judges are going to stretch their minds a bit, it should be in favor of reaching the merits so that they make sure that justice is done. But if Hutton's Eighth Amendment claim was procedurally defaulted in the state court, I would find, unlike my colleagues, that he suffered ineffective assistance of counsel by both trial and appellate counsel so as to overcome the default. I would also necessarily find that Hutton's independent claim of ineffective assistance of counsel is meritorious.

Under *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), Hutton's counsel "fell below an objective standard of reasonableness," and "the deficient performance prejudiced the defense" when trial counsel failed to identify and object to the faulty jury instruction during the penalty phase. It is undisputed that the failure to give the omitted instruction was error and the error was recognized by three of the Ohio Supreme Court justices as plain error. I would find defense counsel's failure to object in this circumstance, more than ten years after the Supreme Court's opinion on aggravators in *Gregg v. Georgia*, to constitute ineffective assistance of counsel. As for appellate counsel, the contention that the Eighth Amendment issue arising from the failure to give the instruction on aggravating circumstances was not equal to or stronger than the issues actually raised by appellate counsel on direct appeal is without merit as confirmed by the issue serving as the sole basis for the dissent by the three Ohio Supreme Court justices. There can be no dispute that Hutton was prejudiced by the ineffectiveness. Hutton has therefore clearly demonstrated cause and prejudice through ineffective assistance of counsel to excuse any default on the Eighth Amendment issue. This may also amount to a due process error but, as described above, the "untrammeled discretion" of the jury during its weighing of aggravators and mitigators allowed the jury to impose the death penalty in violation of the Eighth Amendment.

I would also find along with Judge Donald that a miscarriage of justice would occur if any procedural default were not excused and we failed to reach the merits of Hutton's Eighth Amendment claim. The Supreme Court has stated that

in all cases in which a state prisoner has defaulted his federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas corpus review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice.

*Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006) (quoting *Coleman v. Thompson*, 501 U.S. 722, 749 (1991)). Hutton had a constitutional right to have a jury weigh the two statutory aggravators against the mitigators. By omitting the instruction on the proper aggravators to be considered, the trial court allowed the jury unfettered discretion and violated Hutton's Eighth Amendment right. There is a reasonable likelihood that the result of the penalty phase would have been different had the jury been properly instructed. To allow the death sentence to be carried out when a crucial part of the procedure for choosing between life and death was omitted would be a serious miscarriage of justice.

Now twenty-five years later when Hutton makes the argument on both the Eighth and Sixth Amendment issues, the state, as well as our dissenting colleague, falls back on procedural default and AEDPA to avoid the merits. In my view, the argument of the dissenting justices of the Ohio Supreme Court, and the full court's rejection of it, should not block a federal court in habeas from reaching and deciding the merits of the issues in this capital case. And when we reach the merits, there is only one answer. The trial was unconstitutional, as the dissenting justices found.

I would issue the writ of habeas corpus for these reasons and give the state an opportunity to retry the sentencing phase of the case. But now 30 years after the crime and the beginning of Hutton's incarceration, I do not believe it would be constitutional under the Eighth Amendment's standard of "evolving standards of decency that mark the progress of a maturing society" to impose the death penalty. *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958). The reimposition of the death penalty 30 years later is certainly "unusual," if not unique, and death is different in kind from any other punishment.

_____

## DISSENTING IN PART

_____

ROGERS, dissenting in part.  Percy Hutton's jury-instructions claim is procedurally defaulted, as it was not raised on direct appeal in the state courts.  Hutton concedes as much.[1] Review of that claim is possible, then, only by finding cause and prejudice for the default (which the lead opinion does not do), or by stretching the narrow "fundamental miscarriage of justice" exception far beyond its proper bounds (which the majority does).  Not only does that exception to procedural default not apply in this case, but Hutton never even raised the exception in the district court or on appeal, waiving the argument in that court and in this one.  The procedural rules that constrain federal-court oversight of state criminal proceedings should not be so lightly brushed aside.

Federal courts generally do not entertain claims that are procedurally barred by an "independent and adequate state procedural rule" unless a valid "cause" excuses the default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  Throughout federal and state post-conviction litigation, Hutton has given only one reason for his failure to present the jury-instructions claim on direct appeal: ineffective assistance of appellate counsel.  The ineffective-assistance claim is premised on appellate counsel's failure to raise the jury-instructions issue and trial counsel's purported ineffectiveness for failing to object to the instructions.  As the lead opinion concludes, however, the ineffective-assistance claim warrants no relief, *see* Lead Op. *ante* at 15–16, and so that claim cannot excuse Hutton's default.[2]

_____

[1]Judge Merritt contends that there was no procedural default because the Ohio Supreme Court's silence on Hutton's claim is a ruling on the merits.  Even if the Ohio Supreme Court's deciding on the merits somehow means there was no default by Hutton, this court cannot presume that the state-court majority dismissed the claim on the merits just because three dissenting justices discussed the claim, when Hutton did not even raise the claim on his direct appeal to the state court.  Furthermore, even if such a presumption were appropriate, it would be overcome in this case.  As the lead opinion notes, the state-court majority expressly stated it was *not considering the merits* of Hutton's jury-instructions claim.  *See State v. Hutton*, 559 N.E.2d 432, 437 n.1 (Ohio 1990).

[2]Judge Merritt states that Hutton "suffered ineffective assistance of counsel by both trial and appellate counsel so as to overcome the default."  Merritt Op. *ante* at 4.  Even if defense counsel prejudiced Hutton by deficiently failing to object to the jury instruction during the penalty phase of trial, the lead opinion correctly concludes that appellate counsel's failing to raise an ineffective-assistance claim based on this failure was not deficient, *see* Lead Op. *ante* at 16.  The Ohio Court of Appeals reversed the judgment on five of appellate counsel's

That leaves one possible ground for reviewing the merits of Hutton's jury-instructions claim: the so-called fundamental-miscarriage-of-justice exception to procedural default, an argument that Hutton has waived. The exception is a narrow one, applying only in "extraordinary case[s]." *Gibbs v. United States*, 655 F.3d 473, 477 (6th Cir. 2011) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). To obtain a merits review of a constitutional claim, a petitioner asserting this exception must generally show that an "alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense." *Dretke v. Haley*, 541 U.S. 386, 388 (2004) (citing *Murray*, 477 U.S. 478; *Sawyer v. Whitley*, 505 U.S. 333 (1992)). In addition to cases involving factual innocence, the exception has been applied in the capital sentencing process, but only to the small subset of cases where a habeas "petitioner has shown by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty under [state] law." *Sawyer*, 505 U.S. at 348. In such a case, the petitioner can be said to be "innocent" of the death penalty, even if he is factually guilty of the capital crime. But Hutton has never argued, in this court or in the district court, that he is ineligible for the death penalty. He has therefore unquestionably waived the issue. Hutton's decision not to raise the argument at any point in federal litigation prevents us from analyzing whether he satisfies the fundamental-miscarriage-of-justice exception. *See Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 624 (6th Cir. 2013); *see also Foster v. Michigan*, 573 F. App'x 377, 392–93 (6th Cir. 2014).

In any event, Hutton had good reason not to argue that exception. Any argument concerning the fundamental-miscarriage-of-justice exception would have been a losing one, as a jury would have been authorized to impose the death penalty if the jury instructions had correctly defined "aggravating circumstances." The proper inquiry is not whether a defendant is eligible for the death penalty even with the alleged error. *Compare* Lead Op. *ante* at 14–15. The exception instead focuses on what would have happened if no error had occurred. The *Sawyer* Court used the phrase "but for constitutional error," *Sawyer*, 505 U.S. at 348, a phrase that

---

assignments of error. *State v. Hutton*, No. 51704, 1988 WL 39276, at *6 (Ohio Ct. App. Apr. 28, 1988), *rev'd*, 559 N.E.2d 432 (Ohio 1990). It cannot be that under these circumstances appellate counsel's failure to raise one other colorable issue amounts to conduct that is so woefully inadequate as to constitute ineffective assistance. Furthermore, a court must evaluate the objective reasonableness of counsel's conduct without "the distorting effects of hindsight." *Strickland v. Washington*, 466 U.S. 668, 689 (1984).

requires courts to ask whether, assuming that no error had occurred, a jury would have been authorized by state law to impose the death penalty.[3] In applying that standard, *Sawyer* thus analyzed whether evidence that the state should have furnished to the defendant would have prevented the jury from finding either of the necessary conditions for imposing the death penalty—that the defendant was guilty of the crime and that one or more aggravating circumstances applied. *See id.* at 349–50.

Hutton's eligibility for the death penalty is indisputable. A defendant becomes death-eligible in Ohio when the jury convicts him of a capital murder count with an attached "specification," as that is the point at which the death penalty is placed on the table. *See Wilson v. Mitchell*, 498 F.3d 491, 495 & n.2 (6th Cir. 2007). "Imposition of the death penalty for aggravated murder is precluded unless one or more [statutorily defined specifications] is specified in the indictment . . . and proved beyond a reasonable doubt." Ohio Rev. Code § 2929.04(A). A specification is an "eligibility factor" that satisfies the Eighth Amendment's narrowing requirement. *Wilson*, 498 F.3d at 505; *see also Brown v. Sanders*, 546 U.S. 212, 216 (2006). In this case, the jury found two such factors—mass murder and felony murder—in the process of convicting Hutton of two counts of aggravated murder. Both factors were included in the indictment. That rendered Hutton eligible for the death penalty.

As there is no question about the validity of the two specifications, any error in the *penalty-phase* jury instructions did not affect Hutton's eligibility for the death penalty. The weighing of aggravating circumstances against mitigating evidence does not relate to eligibility. "Once the narrowing requirement has been satisfied, the sentencer is called upon to determine whether a defendant thus found eligible for the death penalty should in fact receive it." *Sanders*, 546 U.S. at 216. At sentencing, the jury thus weighs the aggravating circumstances that "the offender was found guilty of committing" against the mitigating evidence. *See* Ohio Rev. Code § 2929.03(D)(2). (The mass murder and felony murder specifications in Hutton's indictment doubled as aggravating circumstances for sentencing purposes. *See id.* § 2929.04(A)(5), (7).)

---

[3]The Supreme Court in *Sawyer* also endorsed an Eleventh Circuit decision that stated the same test in different words. That formulation required a petitioner to "show that absent the alleged constitutional error, the jury would have lacked the discretion to impose the death penalty." *Sawyer*, 505 U.S. at 347 n.15 (quoting *Johnson v. Singletary*, 938 F.2d 1166, 1183 (11th Cir. 1991) (en banc)).

Any infirmity in the instructions on weighing does not negate a defendant's earlier-determined eligibility.

A hypothetical example demonstrates how this case is different from the type of case that the fundamental-miscarriage-of-justice exception targets. Assume that a defendant was convicted of aggravated murder and that the only aggravating circumstance that the prosecutor argued was an "especially heinous, atrocious, or cruel" factor. At sentencing, the jury weighed that factor against the mitigating evidence en route to the conclusion that the death penalty was warranted. In such a case, the defendant on federal habeas review might be able to show that he was not eligible for the death penalty, allowing the court to reach the merits of his procedurally defaulted claim that an error affected his sentence. That is because the "heinous, atrocious, or cruel" factor is unconstitutionally vague in most applications, *see Maynard v. Cartwright*, 486 U.S. 356, 364–65 (1988), and no other aggravating circumstances were present in the case. "Sensible meaning is given to the term 'innocent of the death penalty' by allowing a showing in addition to innocence of the capital crime itself a showing that there was no aggravating circumstance or that some other condition of eligibility had not been met." *Sawyer*, 505 U.S. at 345. Because no valid aggravating factors supported the defendant's death sentence in the hypothetical, the defendant would be "actually innocent" of that penalty. The same cannot be said of this case.

The Supreme Court's decisions in *Hurst v. Florida*, 136 S. Ct. 616 (2016), and *Ring v. Arizona*, 536 U.S. 584 (2002), have nothing to do with whether Hutton is eligible for the death penalty. "[A] claim of 'actual innocence' is . . . a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Gibbs*, 655 F.3d at 477 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). *Hurst* and *Ring* are relevant, if at all, to the merits of Hutton's claim that constitutional error occurred when the trial judge failed to define the aggravating circumstances. Yet the merits are not reviewable in the context of this case. A federal habeas court has no business reaching a defaulted claim if the petitioner can show neither cause for the default nor that he was innocent of the death penalty.

Even if it were proper to reach the merits, the Supreme Court's decisions in *Hurst* and *Ring* do not require the conclusion that constitutional error occurred. In those cases, state law

required a judge, at a separate penalty hearing, to find aggravating circumstances before sentencing a defendant to death. *Hurst*, 136 S. Ct. 619; *Ring*, 536 U.S. at 588. The Ohio capital system, however, does not work that way. In Ohio, the jury weighs aggravating circumstances and mitigating evidence at sentencing *after* it has already found the aggravating circumstances at the guilt stage. Here, the jury found the mass-murder and felony-murder circumstances at the guilt phase. *Compare* Maj. Op. *ante* at 12. What is more, the trial judge in the penalty-phase instructions reminded the jury that it had made those findings, instructing the jury that "[t]he prosecution has the burden to prove beyond a reasonable doubt that the aggravating circumstances, *of which the Defendant was found guilty*, outweigh the factors in mitigation of imposing the death sentence." (Emphasis added.) This is therefore not a case in which the jury found no aggravating circumstances, but rather a case in which the jury found aggravating circumstances and later received instructions that did not spell out the aggravating circumstances that the jury had previously found.

That distinction makes all the difference for Sixth Amendment purposes. As we indicated in *Webb v. Mitchell*, 586 F.3d 383, 399 (6th Cir. 2009), another Ohio death-penalty case, a state-law error in penalty-phase instructions on weighing may be cured by appellate reweighing of the aggravating circumstances and the mitigating evidence. In that case, the state trial judge erroneously instructed the jury at the penalty phase to consider the *quantity* of the evidence in the weighing analysis rather than the quality. *Id.* at 397. In rejecting an ineffective-assistance claim, we held that any argument that trial counsel could have raised would not have been a strong one, reasoning that "[t]he Ohio Supreme Court has consistently held that . . . 'careful independent reweighing' cures errors by the jury or trial court in 'weighing the aggravating circumstances against any mitigating factors.'" *Id.* at 399 (quoting *State v. Lott*, 555 N.E.2d 293, 304 (Ohio 1990)); *see also Hoffner v. Bradshaw*, 622 F.3d 487, 506 (6th Cir. 2010). Nowhere did we suggest that a penalty-phase error in jury instructions runs afoul of the *Ring* line of cases. In this case, as in *Webb*, the jury found the aggravating circumstances at the guilt phase, before the error in the penalty-phase instructions. And here, as in *Webb*, the Ohio Court of Appeals concluded that the death sentence was appropriate after reweighing the aggravating circumstances against the mitigating evidence. *See State v. Hutton*, 594 N.E.2d 692, 694 (Ohio Ct. App. 1991). There is thus strong reason to doubt the merit of Hutton's claim.

The judgment of the district court denying Hutton relief should be affirmed.  I join all of the lead opinion except Parts II.A and III.